UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 7 2018

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    MAR - 7 2018

CLERK

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Multicultural Media, Telecom and Internet Council, Inc. and National Association of Black-Owned Broadcasters, Petitioners, v. Federal Communications Commission, and United States of America, Respondents. | No. 18-1071 |

## PETITION FOR REVIEW

ORIGINAL

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Fed. Rule App. P. 15(a), Multicultural Media, Telecom and Internet Council, Inc. ("MMTC") and National Association of Black-Owned Broadcasters ("NABOB") petition for review of the Federal Communications Commission's ("FCC"), "Order on Reconsideration," *2014 Quadrennial Regulatory Review*, 32 FCC Rcd. 9802 (rel. Nov. 20, 2017), 83 Fed. Reg. 733 (Jan. 8, 2018) ("Order on Reconsideration").

Venue is proper in this Court under 28 U.S.C. § 2343 because MMTC and NABOB both have their principal offices in Washington, DC.

137932591.1

The Order on Reconsideration (1) "repeals the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the attribution rule for television joint sales agreements, (2) "revises the Local Television Ownership Rule to eliminate the Eight-Voices Test and to modify the Top-Four Prohibition," (3) "provides a favorable presumption for waiver of the Local Radio Ownership Rule's market definitions" in certain transactions, and (4) "rejects requests to change the definition of Shared Service Agreements (SSAs) and the requirement that commercial television stations disclose SSAs by the agreements in each station's online public inspection file." 83 Fed. Reg. at 733-34.

Petitioners seek review of the FCC's repeal of the Radio/Television Cross-Ownership Rule, and the attribution rule for television joint sales agreements; elimination of the Eight-Voices Test; modification of the Top-Four Prohibition; creation of a presumption for waiver of the Local Radio Ownership Rule's market definitions; and decisions not to change the definition of SSAs or to require that commercial television stations disclose SSAs. These final actions will materially impede diversity and localism in the broadcast industry. Petitioners seek review of these

137932591.1

rulings as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.

Petitioners seek a ruling by this Court that vacates the Order On Reconsideration, and directs the FCC:

(1) to reinstate the Radio/Television Cross-Ownership Rule, the attribution rule, and the Eight-Voices Test;

(2) to undo the modification of the Top-Four Prohibition and the presumption for waiver of the Local Radio Ownership Rule's market definitions;

(3) to reconsider whether the definition of SSAs should be changed and the requirement that commercial television stations disclose SSAs.

Respectfully submitted,

*/s/ Dennis Lane*
David D'Alessandro
Dennis Lane
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006
(202) 785-9100
(202) 785-9163 (fax)
david.dalessandro@stinson.com
dennis.lane@stinson.com

137932591.1

*Counsel for*
Multicultural Media, Telecom and Internet
Council, Inc. and National Association of
Black-Owned Broadcasters

Dated: March 7, 2018

137932591.1

ORIGINAL

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Multicultural Media, Telecom and )
    Internet Council, Inc. )
and National Association of )
    Black-Owned Broadcasters, )
              Petitioners, )
      v. )
   )
Federal Communications Commission, )
and United States of America, )
    Respondents. )

No. 18-1071

```
UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED  MAR - 7 2018

          CLERK
```

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. Rule App. P. 26.1 and Circuit Rule 26.1, Petitioner Multicultural Media, Telecom and Internet Council, Inc. ("MMTC") states:

MMTC is a national not-for-profit organization dedicated to promoting and preserving equal opportunity and civil rights in the mass media, telecommunications, and broadcast industries. It has no parent company and has not issued any shares or debt securities to the public; thus no publicly held company owns ten percent or more of its stock.

Pursuant to Fed. Rule App. P. 26.1 and this Court's Rule 26.1, Petitioner National Association of Black-Owned Broadcasters ("NABOB") states:

NABOB is a national not-for-profit organization dedicated to increasing ownership of broadcast radio and television stations and other media by African

138015576.1

Americans and other people of color.  It has no parent company and has not issued

any shares or debt securities to the public; thus, no publicly held company owns

ten percent or more of its stock.

Respectfully submitted,


/s/ Dennis Lane
David D'Alessandro
Dennis Lane
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006
(202) 785-9100
(202) 785-9163 (fax)
david.dalessandro@stinson.com
dennis.lane@stinson.com

Counsel for
Multicultural Media, Telecom and Internet
Council, Inc. and National Association of Black-
Owned Broadcasters


Dated: March 7, 2018

## CERTIFICATE OF SERVICE

I hereby certify, that this 7th day of March, 2018, I caused copies of the

foregoing Petition for Review and Corporate Disclosure Statement to be served via

first-class mail to:

Thomas M. Johnson, Jr.
General Counsel
Federal Communications Commission
445 12th Street, SW
Room 8-A741
Washington, DC 20554


The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530


_/s/  Dennis Lane_
Dennis Lane

# ATTACHMENT

Information Center, Portals II, 445 12th Street SW, Room CY–A257, Washington, DC 20554. The full text of this document and any subsequently filed documents in this matter may also be found by searching ECFS at: *http://apps.fcc.gov/ecfs/.*

**Final Paperwork Reduction Act of 1995 Analysis**

The Order does not contain any new or modified information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104–13. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, *see* 44 U.S.C. 3506(c)(4).

**Congressional Review Act**

The Commission sent a copy of the Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

**Synopsis**

1. The IAC, formerly known as the Local and State Government Advisory Committee (LSGAC), was created in 1997 to provide guidance to the Commission on issues of importance to state, local, county, and Tribal governments, as well as to the Commission. The Committee is currently composed of 15 elected and appointed officials of those governmental entities.

2. The Committee has provided ongoing advice and information to the Commission on a broad range of telecommunications issues in which state, local, county, and Tribal governments share ''intergovernmental responsibilities or administration'' with the Commission, including cable and local franchising, public rights-of-way, facilities siting, universal service, barriers to competitive entry, and public safety communications.

3. The Commission has often found over the years that an IAC membership of just 15 does not often capture the varied perspectives of our regulatory partners across the country. The IAC works best and its advice helps the Commission the most when it fully represents perspectives of rural, urban, and suburban jurisdictions from various geographic areas throughout the United States.

4. By expanding its membership to 30, the Commission better enable the IAC's ability to represent perspectives and viewpoints from all relevant governmental entities and sectors, and to further promote valuable, comprehensive, and balanced input that more comprehensively reflects the views and expertise of our regulatory partners. The Commission's experience with other advisory committees of similar size shows this to be the case.

5. The Commission continue to believe that IAC representation from each category of state, local, county, and Tribal government is important. Thus, the number of members from each category set forth in our current rules shall now serve as a minimum threshold. The Committee will now consist of 30 members, of which at least four shall be elected municipal officials, at least two shall be elected county officials, at least one shall be a local government attorney, at least one shall be an elected state executive, at least three shall be elected state legislators, at least one shall be a public utilities or public service commissioner, and at least three shall be Native American Tribal representatives. The Commission's approach will give the Commission flexibility to expand the number and diversity of viewpoints from these sectors while ensuring none is under-represented.

**Ordering Clauses**

6. The rule modifications adopted constitute rules of agency organization, procedure and practice. Therefore, the modification of § 0.701 of the Commission's rules is not subject to the notice and comment and effective date provisions of the Administrative Procedure Act. *See* 5 U.S.C. 553(b)(3)(A), (d).

7. Pursuant to sections 4(i), 4(j), and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. 154(i), 154(j), and 303(r), subpart G, § 0.701 of the Commission's rules, 47 CFR 0.701, modified as set forth in the Order, is adopted.

**List of Subjects in 47 CFR Part 0**

Organization and functions (Government agencies).

Federal Communications Commission.

**Katura Jackson,**
*Federal Register Liaison Officer.*

**Final Rule**

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 0 as follows:

**PART 0—COMMISSION ORGANIZATION**

■ 1. The authority citation for part 0 is revised to read as follows:

**Authority:** Secs. 5, 48 Stat. 1068, as amended; 47 U.S.C. 155, unless otherwise noted.

■ 2. Amend § 0.701 by revising paragraph (b) to read as follows:

**§ 0.701  Intergovernmental Advisory Committee.**

\*    \*    \*    \*    \*

(b) *Membership.* The IAC will be composed of 30 members (or their designated employees), with a minimum of: Four elected municipal officials (city mayors and city council members); two elected county officials (county commissioners or council members); one elected or appointed local government attorney; one elected state executive (governor or lieutenant governor); three elected state legislators; one elected or appointed public utilities or public service commissioner; and three elected or appointed Native American tribal representatives. The Chairman of the Commission will appoint members through an application process initiated by a Public Notice, and will select a Chairman and a Vice Chairman to lead the IAC. The Chairman of the Commission will also appoint members to fill any vacancies and may replace an IAC member, at his discretion, using the appointment process. Members of the IAC are responsible for travel and other incidental expenses incurred while on IAC business and will not be reimbursed by the Commission for such expenses.

\*    \*    \*    \*    \*

[FR Doc. 2018–00015 Filed 1–5–18; 8:45 am]

**BILLING CODE 6712–01–P**

---

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Part 73**

[MB Docket Nos. 14–50, 09–182, 07–294, 04–256, and 17–289; FCC 17–156]

**2014 Quadrennial Regulatory Review**

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, an *Order on Reconsideration* repeals and modifies several of the Commission's broadcast ownership rules. Specifically, this document repeals the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the attribution rule for television joint sales agreements. This document also revises the Local Television Ownership Rule to eliminate the Eight-Voices Test and to modify the

Top-Four Prohibition to better reflect the competitive conditions in local markets. This document provides a favorable presumption for waiver of the Local Radio Ownership Rule's market definitions as to transactions in certain embedded markets. Lastly, this document rejects requests to change the definition of Shared Service Agreements (SSAs) and the requirement that commercial television stations disclose SSAs by placing the agreements in each station's online public inspection file. In addition, the document finds that the record supports adoption of an incubator program to promote ownership diversity. The *Order on Reconsideration* grants in part and denies in part the Petitions for Reconsideration filed separately by the National Association of Broadcasters (NAB), Nexstar Broadcasting, Inc. (Nexstar), and Connoisseur Media LLC (Connoisseur).

**DATES:** Effective February 7, 2018 except for the amendment to § 73.3613, which contains information collection requirements that are not effective until approved by the Office of Management and Budget (OMB). The Commission will publish a document in the **Federal Register** announcing the effective date of these changes.

**FOR FURTHER INFORMATION CONTACT:** Benjamin Arden, Industry Analysis Division, Media Bureau, FCC, (202) 418–2605. For additional information concerning the PRA information collection requirements contained in the *Second Report and Order*, contact Cathy Williams at (202) 418–2918, or via the internet at *PRA@fcc.gov*.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's *Order on Reconsideration,* in MB Docket Nos. 14–50, 09–182, 07–294, 04–256, and 17–289; FCC 17–156, was adopted on November 16, 2017, and released on November 20, 2017. The complete text of this document is available electronically via the search function on the FCC's Electronic Document Management System (EDOCS) web page at *https://apps.fcc.gov/edocs_public/*. The complete document is available for inspection and copying during normal business hours in the FCC Reference Information Center, 445 12th Street SW, Room CY–A257, Washington, DC 20554. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the FCC's Consumer and Governmental Affairs Bureau at (202) 418–0530 (voice), (202) 418–0432 (TTY).

**Synopsis**

**I. Introduction**

1. In this *Order on Reconsideration* (*Order*), the Commission grants in part and denies in part, as set forth in this *Order,* various petitions for reconsideration of the *Second Report and Order* (81 FR 76220, Nov. 1, 2016, FCC 16–107, rel. Aug. 25, 2016). Specifically, the Commission (1) eliminates the Newspaper/Broadcast Cross-Ownership Rule; (2) eliminates the Radio/Television Cross-Ownership Rule; (3) revises the Local Television Ownership Rule to eliminate the Eight-Voices Test and to modify the Top-Four Prohibition to better reflect the competitive conditions in local markets; (4) declines to modify the market definitions relied on in the Local Radio Ownership Rule, but provides a presumption for certain embedded market transactions; (5) eliminates the attribution rule for television joint sales agreements (JSAs); and (6) retains the disclosure requirement for shared service agreements (SSAs) involving commercial television stations. In addition, the Commission finds that the present record supports adoption of an incubator program to promote ownership diversity; however, the structure and implementation of such a program requires further exploration.

**II. Background**

2. Congress requires the Commission to review its broadcast ownership rules every four years to determine whether they are necessary in the public interest as the result of competition and to repeal or modify any regulation the Commission determines to be no longer in the public interest. On August 10, 2016, the Commission adopted the *Second Report and Order* (released on August 25, 2016) to resolve both the 2010 and 2014 quadrennial review proceedings, as well as to address various issues related to the attribution of television JSAs, diversity initiatives, and SSAs.

3. The *Second Report and Order* largely retained the existing broadcast ownership rules, reinstated the previously vacated Television JSA Attribution Rule, and adopted a definition of SSAs and a disclosure requirement for SSAs involving commercial television stations. The Commission also committed to explore various diversity-related proposals in the record, while declining to adopt other proposals, including an incubator program. Several parties sought reconsideration of various aspects of the *Second Report and Order.* NAB petitioned the Commission to

reconsider its decisions regarding the Local Television Ownership Rule, television JSA attribution, SSA disclosure, the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the rejection of NAB's proposal to create an incubator program to encourage diversity. On January 24, 2017, the Office of Communication, Inc. of the United Church of Christ (UCC), the Media Alliance, the National Organization for Women Foundation, the Communications Workers of America, the Newspaper Guild, the National Association of Broadcast Employees and Technicians, Common Cause, the Benton Foundation, Media Council Hawai'i, the Prometheus Radio Project, and the Media Mobilizing Project (UCC et al.) filed a motion to strike and dismiss the NAB Petition on the grounds that the petition improperly evades the strict 25-page limit on reconsideration petitions by using a prohibited, undersized font for footnotes and inserting a substantial portion of its argument into those footnotes in violation of 47 CFR 1.49(a). The motion also alleges that NAB's summary was well over twice the permissible length, and improperly contains additional arguments in violation of 47 CFR 1.49(c). In reply, NAB states that it did not intend to evade any Commission rules and offers to refile if the Commission is concerned about UCC et al.'s allegations. In addition, NAB cites precedent that the Commission has considered previously the merits of an application for review well in excess of the 25-page limit and notes that parties adverse to NAB have pleadings in the proceeding that violate 47 CFR 1.49 but have been considered on the merits by the Commission. The Commission denies UCC et al.'s motion. The Commission finds that, to the extent that NAB's pleading does not precisely conform to 47 CFR 1.49, no party has been prejudiced, and the public interest is best served by considering NAB's arguments. The Commission reminds parties, however, to be mindful of the requirements of § 1.49.

4. Nexstar also challenged the Local Television Ownership Rule and the attribution of television JSAs, while Connoisseur challenged an aspect of the Local Radio Ownership Rule related to embedded markets.

**III. Media Ownership Rules**

*A. Newspaper/Broadcast Cross-Ownership Rule*

1. Introduction

5. Upon reconsideration, the Commission repeals the Newspaper/

Broadcast Cross-Ownership (NBCO) Rule in its entirety. The Commission's decision to repeal the rule means that all newspapers (print or digital) now will be allowed to combine with television and radio stations within the same local market, subject to the remaining broadcast ownership rules and any other applicable laws, including antitrust laws. The Commission finds that prohibiting newspaper/broadcast combinations is no longer necessary to serve the goal of promoting viewpoint diversity in light of the multiplicity of sources of news and information in the current media marketplace and the diminished voice of daily print newspapers. Whatever the limited benefits for viewpoint diversity of retaining the rule, in today's competitive media environment, they are outweighed by the costs of preventing traditional news providers from pursuing cross-ownership investment opportunities to provide news and information in a manner that is likely to ensure a more informed electorate. As such, the NBCO Rule no longer serves the public interest and must be repealed pursuant to Section 202(h).

## 2. Background

6. In the *Second Report and Order,* the Commission affirmed its previous findings that an absolute ban was overly restrictive, but concluded that some newspaper/broadcast cross-ownership restrictions continued to be necessary to promote viewpoint diversity. It retained the general prohibition on common ownership of a broadcast station and a daily print newspaper in the same local market, but adopted minor changes to the rule to accomplish what the Commission called a modest loosening of the absolute ban. The Commission: (1) modified the geographic scope of the rule to update its analog parameters and to reflect more accurately the markets that newspapers and broadcasters actually serve; (2) adopted an explicit exception for failed and failing broadcast stations and newspapers; and (3) created a case-by-case waiver standard whereby the Commission would grant relief from the rule if the applicants showed that a proposed merger would not unduly harm viewpoint diversity in the market. The Commission declined to eliminate the newspaper/radio cross-ownership restriction from the NBCO Rule after finding that, despite its earlier tentative conclusion that radio stations typically are not primary outlets for local news, radio stations nonetheless provide a meaningful amount of local news and information such that lifting the restriction could harm viewpoint diversity. In addition, the Commission explained that, although the rule may benefit ownership diversity incidentally, the agency's purpose in retaining the rule was not to promote minority or female ownership. NAB petitioned the Commission to reconsider its retention of the NBCO Rule.

## 3. Discussion

7. The Commission finds that the NBCO Rule must be repealed because it is not necessary to promote the Commission's policy goals of viewpoint diversity, localism, and competition, and therefore does not serve the public interest. Because the Commission is repealing the NBCO Rule on other grounds, it is unnecessary to address arguments that rule should be repealed on competition grounds. Similarly, it is unnecessary to reach arguments that ownership does not influence viewpoint because the Commission is eliminating the rule on the ground that, even if ownership might influence viewpoint in certain circumstances, the NBCO Rule is not necessary to foster viewpoint diversity (nor to promote localism or competition). The parties that support reconsideration of the NBCO Rule argue that the modifications adopted in the *Second Report and Order* were insufficient and that the rule is obsolete and should be eliminated. The Commission agrees. The Commission affirms its longstanding determination that the rule does not advance localism and competition goals, and finds that it is no longer necessary to promote viewpoint diversity, the rule's only remaining policy justification. Although elimination of the rule could theoretically diminish viewpoint diversity to a limited extent due to the loss of an independent voice as a result of any newspaper/broadcast combination, the Commission finds that this impact will be mitigated by the multiplicity of alternative sources of local news and information available in the marketplace and the overall financial decline of newspapers. In addition, the Commission finds that this concern is outweighed by the countervailing benefits to consumers that can result from newspaper/broadcast combinations. Finally, based on the Commission's review of the record, the Commission finds that eliminating the rule will have no material effect on minority and female broadcast ownership. Accordingly, the Commission grants the request that it eliminate the NBCO Rule.

8. *The Marketplace Has Changed Dramatically.* On reconsideration, the Commission finds that its decision to retain the NBCO Rule failed to acknowledge the current realities of the media marketplace. In 1975, the broadcast industry was still relatively young, but it had found its footing, owing in part to the role that newspaper/broadcast cross-ownership had played in its success. Supporters of common ownership claimed that joint ownership of newspapers and broadcast stations made possible the early development of FM and TV service even though these pioneering stations often had to be operated at a loss. In adopting the cross-ownership rule, the Commission acknowledged the pioneering role of newspapers in the broadcast medium but found that common ownership with newspapers was no longer a critical factor for broadcaster success. The Commission observed that, on the whole, the broadcast industry had matured to the point that new entrants could be expected to have an interest in pursuing station ownership. It concluded that the special reason for encouraging newspaper ownership, even at the cost of a lessened diversity, was no longer generally operative in the way it once was. The Commission understood its obligation to give recognition to the changes which have taken place and see to it that its rules adequately reflect the situation as it is, not was.

9. That same obligation now requires the Commission to eliminate the NBCO Rule. Not only have the means of accessing content changed dramatically, but the media marketplace has seen an explosion in the number and variety of sources of local news and information since the Commission adopted the NBCO Rule in 1975. Opponents of the rule point to this increase and argue that the NBCO Rule has become obsolete as a result.

10. From the 6,197 full-power radio stations and 851 full-power television stations that existed in the late 1960s, the Commission's latest broadcast totals place the number of full-power radio stations at 15,512 and full-power television stations at 1,775. Contrary to the Commission's conclusion in the *Second Report and Order,* the fact that the number of full-power broadcast stations has more than doubled represents a significant increase that should be considered when evaluating the continued necessity of the NBCO Rule. It was improper for the Commission to dismiss data submitted by Bonneville International Corp. and The Scranton Times, L.P., demonstrating a substantial increase in

the number of broadcast services simply because it represented a nationwide increase which may have been spread unevenly across individual local markets without citing any evidence to support this notion. In addition, the Commission should have taken into account the number of low-power broadcast stations, which, as of June 2017, includes 417 Class A television stations; 1,968 low-power television (LPTV) stations; and 1,966 low-power FM (LPFM) stations—none of which services existed when the rule was adopted. This situation is a stark contrast to the state of affairs in 1975, when the changed circumstances in the broadcasting industry that prompted adoption of the NBCO Rule included a trend in which the number of channels open for new licensing had diminished substantially.

11. Equally, if not more significantly, NAB cites evidence of the growing prevalence of independent digital-only news outlets with no print or broadcast affiliation, many with a local or hyperlocal focus. Thirteen years ago, the Third Circuit agreed with the Commission that the record suggested that cable and the internet contribute to viewpoint diversity; the panel members simply disagreed about the degree and importance of this trend at that time. Since then, however, the picture has changed significantly. Even the U.S. Supreme Court recently recognized the importance of the internet and social media as sources of news and information for many Americans. As this trend continues to gain momentum and new voices proliferate, the dominance of traditional news outlets diminishes. Although the record contains some evidence that local television stations and newspapers may still be consumers' primary sources of local news and information, the Commission finds that it improperly discounted the role of non-traditional news outlets, including internet and digital-only, in the local media marketplace.

12. The Commission concluded in the *Second Report and Order* that online outlets do not serve as a substitute for newspapers and broadcasters providing local news and information. As noted below, this conclusion does not appear to reflect the record evidence as to how the internet has transformed the American people's consumption of news and information, the direction of current trends in this regard, and in particular how those trends have affected younger adults. At a minimum, the record reflects studies that reject the premise that people have a primary or single source for most of their local

news and information. Rather, the picture revealed by the data is that of a richer and more nuanced ecosystem of community news and information than researchers have previously identified, in which Americans turn to a wide range of platforms to get local news and information. Thus, the contributions of such outlets cannot be dismissed out of hand as the existence of these non-traditional news outlets nevertheless results in greater access to independent information sources in local markets. Furthermore, the Commission failed to acknowledge adequately evidence in the record demonstrating the emergence of online outlets that offer local content and have no affiliation with traditional broadcast or print sources.

13. Numerous studies cited in the record establish the emergence and growth of alternative sources of local news and information, including digital-only local news outlets as well as other online sources of local news and information. For example, according to a 2014 Pew Research study, out of 438 digital news sites examined, more than half had a local focus, with the typical outlet described as focused on coverage of local or even neighborhood-level news. Even by 2011, a Pew study confirmed that while newspapers remain popular sources for some such information, 69 percent of those surveyed said that if their local newspaper no longer existed, it would not have a major impact on their ability to keep up with information and news about their community. By 2016, Pew reported that just 20 percent of U.S. adults often get news from print newspapers, with even steeper declines in particular demographics—only 5 percent of those aged 18 through 29, and only 10 percent of those aged 30 through 49. According to the earlier Pew study, for the 79 percent of Americans who are online, the internet is the first or second most important source for 15 of the 16 local topics examined. Nearly half of adults (47 percent) use mobile devices to get local news and information, and for none of Pew's topics did more than 6 percent of respondents say they depended on the website of a legacy news organization. Among adults under age 40, the web ranks first or ties for first for 12 of the 16 local topics asked about. Furthermore, in the *Second Report and Order,* the Commission too readily dismissed cable news programming as primarily targeted to a wide geographic audience, without considering that most of the major cable operators carry locally-focused cable news networks in parts of their footprint.

14. On reconsideration, the Commission finds that the record clearly demonstrates that the wealth of additional information sources available in the media marketplace today, apart from traditional newspapers and broadcasters, strongly supports repealing the NBCO Rule. These dramatic and ongoing changes in the media industry negate concerns that repealing the NBCO Rule will harm viewpoint diversity. The Commission does not perceive a need for the rule in light of the current trends toward greater consumer reliance on these alternative sources of local news and information. The Commission's failure to account properly for the multiplicity of news and information sources available in the current media marketplace factored heavily in its unjustified retention of the NBCO Rule.

15. *The Decline of the Newspaper Industry Has Diminished its Voice.* In addition, restrictions on common ownership of daily print newspapers and broadcast stations are no longer justified to protect viewpoint diversity as the strength of daily print newspapers has declined significantly since 1975. In the *Second Report and Order,* the Commission failed to credit properly the evidence in the record regarding the challenges facing the newspaper industry and the resulting effects on the ability of print newspapers to serve their readers. Rather than merely modifying the rule's waiver standard and adjusting its carve-outs, the Commission should have acknowledged the diminution of newspapers' voices and concluded that the time has come to eliminate the rule altogether.

16. In light of the long decline of the newspaper industry, the loss of an independent daily newspaper voice in a community will have a much smaller impact on viewpoint diversity than would have been the case in 1975. In addition, as discussed below, repeal of the NBCO Rule will permit newspaper/broadcast combinations that can strengthen local voices and thus enable the combined outlets to better serve their communities.

17. *The NBCO Rule Prevents Combinations that Could Benefit Localism.* The Commission repeatedly has recognized that the NBCO Rule does not promote localism and actually may hinder it by preventing local news outlets from achieving efficiencies by combining resources needed to gather, report, and disseminate local news and information. The Commission nevertheless retained newspaper/ broadcast cross-ownership restrictions in order to promote its goal of viewpoint

diversity. Because the NBCO Rule is no longer necessary to foster viewpoint diversity, and the rule can be repealed without harming the public interest, the potential benefits to localism arising from common ownership finally can accrue. The Commission expects that eliminating the NBCO Rule will allow both broadcasters and newspapers to seek out new sources of investment and operational expertise, increasing the quantity and quality of local news and information they provide in their local markets.

18. There is ample evidence in the record that eliminating the rule will help facilitate such investment and enable both broadcasters and newspapers to better serve the public. For example, Cox Media Group, LLC (Cox) asserts that collaboration and cost-sharing between its television station and its newspaper in Dayton, Ohio, helped them be the first to report on what became a national story about the failures of the Veterans Administration to provide adequate medical services. In addition, Cox previously provided several examples showing how the combination of resources across its commonly owned newspaper, television, and radio properties in both Dayton and Atlanta, Georgia, allowed them to report on breaking news stories more quickly and accurately and to also provide more thorough coverage of events, such as political elections, that involve numerous interviews and in-depth issue reporting. Cox asserts that the common ownership of multiple outlets has enabled its media properties "to vastly improve service at a time when the economics of the newspaper and broadcast business would seem to dictate the opposite." In addition, the News Media Alliance (NMA) provided numerous examples of the benefits to local programming involving cross-owned media outlets in various markets. For example, a cross-owned newspaper/television combination in Phoenix combined resources to report on stories such as the shooting of Congresswoman Gabrielle Giffords and 18 others in Tucson, the Yarnell Hill fire that killed 19 firefighters and destroyed more than 100 homes, and a massive dust storm. In South Bend, Indiana, a commonly owned local newspaper, television station, and two radio stations regularly worked together on issues of local significance, such as uncovering harmful substances in drinking water, hosting town-hall meetings for political candidates and local officials, sending a reporter to Iraq, commemorating the 150th anniversary of the local Studebaker factory, providing weather

information, and covering Notre Dame sports. NMA also cited prior Commission studies for the proposition that, on average, a cross-owned television station produces more local news and more coverage of local and state political candidates than comparable non-cross-owned television stations. NMA pointed to the finding in one Commission study that cross-owned television stations, on average, air 50 percent more local news than non-cross-owned stations. The Commission's Media Ownership Study 4 also found that the total amount of local news aired by all television stations in the market may be negatively correlated with newspaper/television cross-ownership. As noted in the *FNPRM* (79 FR 29010, May 20, 2014, FCC 14–28, rel. Apr. 14, 2014), however, the study authors cautioned that this finding was imprecisely measured and not statistically different from zero. An earlier Commission study cited by NMA found that cross-owned television stations aired between seven to ten percent more local news, which still represents a meaningful increase in the average amount of local news aired on cross-owned television stations. This study also found that cross-owned television stations, on average, provide roughly 25 percent more coverage of local and state politics. The Commission has acknowledged that prior Commission studies have found that cross-owned radio stations are more likely to air news and public affairs programming and are four to five times more likely to have a news format than a non-cross-owned station. Comments in this proceeding bear that out, providing anecdotal evidence, such as that offered by Morris Communications, which explained that its radio stations in Topeka, Kansas, and in Amarillo, Texas, were able to invest more heavily in local news production and in news staff because of their cross-ownership with the local newspaper. As the Commission discussed in the *Second Report and Order,* the record contains support for the proposition that newspaper/broadcast combinations can promote localism by creating efficiencies through the sharing of expertise, resources, and capital that can lead to a higher quantity and quality of local news programming. The Commission has long accepted that proposition, but it concluded in its previous decisions that some restrictions remained necessary to promote viewpoint diversity. The Commission concludes now that the potential public interest benefits of permitting newspaper/broadcast

combinations outweigh the minimal loss of viewpoint diversity that may result from eliminating the rule. With the elimination of the NBCO Rule these localism benefits can finally begin to materialize.

19. In light of the well-documented and continuing struggles of the newspaper industry, the efficiencies produced by newspaper/broadcast combinations are more important than ever. A report in February 2017 examining the health of small newspapers was cautiously optimistic about the future of publications with a community or hyperlocal focus but acknowledged that their battle for survival will not be easy and will require new approaches and strategies that take advantage of their niche position. Removing the regulatory obstacle of this outdated rule will help financially troubled newspapers carry on their important work. While the Commission recognizes that cost-savings gained from common ownership will not necessarily be invested in the production of local news, by allowing newspapers and broadcasters to collaborate and combine resources, the Commission's action in this *Order* creates new opportunities for local broadcasters and newspapers to better serve the local news and information needs of their communities.

20. *The NBCO Rule Must be Eliminated.* The Commission's decision to repeal the rule reflects the situation as it currently is, not as it was more than 40 years ago. Whereas the Commission determined in 1975 that newspaper/broadcast combinations were no longer necessary to support the growth of the broadcast industry and that the interest in viewpoint diversity required separate ownership of newspapers and broadcast licenses, the Commission now determines that this restriction is no longer necessary to promote viewpoint diversity and can potentially harm localism, and that removing the restriction best serves the public interest.

21. Indeed, even to the extent that eliminating the rule would permit transactions that would reduce the number of outlets for news and information in local markets, the markets will continue to have far more voices than when the rule was enacted. The modern media marketplace abounds with new, non-traditional voices, the number of local broadcasters has increased dramatically, and the strength of local newspapers relative to other media has diminished as a result of the difficulties facing the industry and the rise of new voices. And the Commission expects the number of

USCA Case #18-1071    Document #1721291    Filed: 03/07/2018    Page 14 of 33

voices to continue to grow, as the internet, in particular, has lowered the barriers to entry and provided a publicly accessible platform for individuals and organizations to serve the news and information needs of their local communities. Furthermore, eliminating the NBCO Rule will permit efficient combinations that will allow broadcasters and newspapers to combine resources and enable them to better serve their local communities. On balance, therefore, the Commission concludes that retaining the rule does not serve the public interest.

22. The Commission consistently has recognized that changing circumstances in the marketplace warrant a retreat from a total ban; accordingly, the Commission has attempted to impose various limits on the rule through the years. The Commission's overall direction has been toward a growing acknowledgment that the rule is not always necessary to promote viewpoint diversity and should be modified to reflect changes in the marketplace. The Commission's action in this *Order* is simply the logical extension of this acknowledgment in response to the radically altered media marketplace.

23. As noted in the *2002 Biennial Review Order* (68 FR 46286, Aug. 5, 2003, FCC 03–127, rel. July 2, 2003), the Commission must consider the impact of [its] rules on the strength of media outlets, particularly those that are primary sources of local news and information, as well as on the number of independently owned outlets. Maximizing the number of independent voices does not further diversity if those voices lack the resources to create and publish news and public information. In *Prometheus Radio Project* v. *FCC,* 373 F.3d 372 (3d Cir. 2004) (*Prometheus I*), the court affirmed the Commission's finding in the *2002 Biennial Review Order* that the NBCO Rule was overbroad and should be relaxed. In the *2006 Quadrennial Review Order* (73 FR 9481, Feb. 21, 2008, FCC 07–216, rel. Feb. 2008), the Commission took into consideration the imperiled state of the newspaper industry, recounting statistics and data showing that the shrinking newspaper industry had suffered circulation declines, staff layoffs, shuttered news bureaus, flat advertising revenues, rising operating costs, and falling stock prices. These hardships influenced the Commission's finding that the existing ban on newspaper/broadcast combinations continued to be overly restrictive.

24. The newspaper industry had not recovered when the Commission began its 2010/2014 ownership review and, indeed, the hardships continued to

mount. In its 2010 *NOI* (75 FR 33227, June 11, 2010, FCC 10–92, rel. May 25, 2010), the Commission described newspapers' declining circulation and advertising revenues and asked whether relaxing the rule would help newspapers to survive. In the *FNPRM,* the Commission expressed concern for the future of newspapers but disagreed with the suggestion that the NBCO Rule should be repealed or relaxed on that basis alone. The Commission was reluctant to jeopardize viewpoint diversity in local markets in response to assertions that the rule limited opportunities for traditional media owners to expand their revenues. Now, however, the Commission concludes that the continuance of the NBCO Rule is not necessary or appropriate to preserve or promote viewpoint diversity under Section 202(h). The Commission anticipates that both newspapers and broadcasters will benefit from the rule's repeal, as will, ultimately, the public, as discussed above.

25. The Commission recognized in the *FNPRM* that the NBCO Rule does not promote viewpoint diversity when a newspaper is in financial distress, and the *FNPRM* proposed an exception to the rule for failed and failing merger applicants. In the *Second Report and Order,* the Commission adopted that exception and explained that allowing such mergers is not likely to harm viewpoint diversity. In addition, the Commission incorporated into the rule a case-by-case waiver standard for markets of all sizes to account for merger situations that do not pose an undue risk to viewpoint diversity.

26. On reconsideration, the Commission finds that its modifications to the NBCO Rule in the *Second Report and Order* were inadequate. Given the current state of the newspaper industry, it might very well be too late to save a newspaper that would qualify as failed or failing under the exception adopted in the *Second Report and Order.* The Commission's goal should be to keep local voices strong, not to maintain artificial barriers that prevent efficient combinations and then wait until newspapers reach a failed or failing state before providing regulatory relief. In addition, the Commission's case-by-case waiver standard was wholly insufficient because the Commission failed to provide any meaningful guidance on how it would evaluate each waiver request. An exception or a waiver standard may be appropriate when a rule is sound and exceptional circumstances exist, but such mechanisms do not redeem an unsound rule, as the Commission finds this one to be.

27. In addition, the modified rule inexplicably left in place a definition of daily newspaper that is outdated and illogical in that it applies only to newspapers printed at least four days a week. The distinction between print newspapers and digital outlets has become blurred as some newspapers reduce the number of days a week they publish in print and rely more heavily on their online distribution. Indeed, many publishers today continuously update the content of the online versions of their newspapers as they compete with bloggers and social media that rapidly produce and update their own content. Applying the NBCO Rule to newspapers only if they are printed in hardcopy at least four days per week ignores the reality that what defines a newspaper has changed and that many consumers access the paper's news and information over the internet throughout the day. A newspaper's influence should no longer be measured by how many mornings a week it is delivered to the doorstep. Doing so would exacerbate the perverse incentive for a newspaper seeking to combine with a broadcaster to reduce its print editions in order to avoid triggering the rule. Given the current media marketplace and the way consumers access content, the rule's reliance on a newspaper's printing schedule makes no sense.

28. As the modified rule adopted in the *Second Report and Order* is not necessary to promote the public interest, the Commission cannot retain it consistent with Section 202(h). the Commission emphasizes that the rule's repeal in no way reflects a lessening of the importance of viewpoint diversity as a Commission policy goal. Rather, the Commission concludes that the rule is no longer necessary to promote viewpoint diversity.

29. The Commission finds also that the NBCO Rule should be eliminated rather than relaxed. The Commission's previous attempts to relax the rule demonstrate the difficulty in designing an approach that works effectively for the range of market circumstances across the country. Paradoxically, previous attempts at relaxing the rule arguably threatened the greatest harm in small markets where cross-ownership may be needed most to sustain local news outlets. The record does not provide an adequate basis for distinguishing areas where application of the rule could serve the public interest from those where it would not. There was significant opposition to the modified rule proposed by the Commission in this proceeding, and only one commenter proposed a

detailed alternative approach, and the Commission explained why it declined to adopt it. Thus, the record does not support a narrowed restriction. Moreover, as discussed above, the Commission finds that it would be outdated and illogical to adopt a rule based on the distinction between print newspapers and digital outlets. Indeed, any modified rule that continues to single out newspapers of any kind cannot be sustained.

30. In light of the significantly expanded media marketplace and the overall state of the newspaper industry, and the Commission's conclusion that the rule is not necessary to promote viewpoint diversity, competition, or localism, and may hinder localism, the Commission concludes that immediate repeal is required by Section 202(h) and will permit combinations that would benefit consumers. The Commission's decision will enable all broadcasters and newspapers to attract new investment in order to preserve and expand their local news output.

31. In addition, though the Commission finds that the entire NBCO Rule must be eliminated, the Commission finds that the record provides an additional and independent justification for eliminating the restriction on newspaper/radio combinations. Opponents of this aspect of the rule argue that evidence in the record does not provide adequate support for the Commission's conclusion that radio is a sufficiently meaningful source of local news and public interest programming such that allowing newspaper/radio combinations could harm viewpoint diversity. The Commission agrees. As discussed in the following section, the Commission is eliminating the Radio/Television Cross-Ownership Rule based on its finding that the diminished contributions of local broadcast radio stations to viewpoint diversity, together with increasing contributions from new media outlets and the public interest benefits of radio/television combinations, no longer justify continued radio/television cross-ownership regulation. For the same reasons relating to viewpoint diversity contributions of radio and the proliferation of alternative media voices, as well as the countervailing public interest benefits of newspaper/radio combinations, the Commission concludes that the restriction on newspaper/radio combinations is not in the public interest and must be eliminated pursuant to Section 202(h).

32. *Minority and Female Ownership.* The Commission finds that repealing the NBCO Rule will not have a material impact on minority and female ownership. After seeking public comment on this topic a number of times, the Commission expressed its view that the rule does not promote or protect minority and female ownership. Not only have past debates on this issue not persuaded the Commission that the ban on newspaper/broadcast combinations is necessary to protect or promote minority and female ownership, no arguments were made in this reconsideration proceeding that would lead the Commission to conclude otherwise. On the contrary, two organizations representing minority media owners seek relief from the rule's restrictions. Their comments directly refute arguments in the record that repealing the rule will harm small broadcasters, including minority and women broadcasters, because they are at a competitive disadvantage compared to large media outlets. As the Commission contemplated in the *FNPRM,* merging with a newspaper could boost the ability of a small broadcaster to compete more effectively in the market and to improve its local news offerings. The Commission's action in this *Order* will provide the flexibility to do just that.

33. The Commission agrees with comments stating that lifting the ban on newspaper/radio combinations is unlikely to have a significant effect on minority and female ownership in the radio market given that the thousands of radio stations across the country offer plenty of purchasing opportunities for minorities and women and at lower cost than most other forms of traditional media. In addition, the Commission does not anticipate that lifting the ban on newspaper/television combinations will lead to a meaningful decrease in the number of minority-owned television stations. Some groups previously expressed concern that minority-owned television stations would be targeted for acquisition if the ban were relaxed to favor waiver requests for certain newspaper/television combinations with stations ranked below the top four television stations in a market—a category that includes many minority-owned stations. Removing the ban across-the-board will ensure that no artificial incentives are created, and the record provides no evidence that minority- and female-owned stations will be singled out for acquisition, as some commenters have speculated. To the contrary, record evidence demonstrates that previous relaxations of other ownership rules have not resulted in an overall decline in minority and female ownership of broadcast stations, and the Commission sees no evidence to suggest that eliminating the NBCO Rule will produce a different result and precipitate such a decline. Ultimately, given the state of the newspaper industry, the Commission expects that broadcasters may be better positioned to be the buyer, rather than the seller, in most transactions that flow from the rule's repeal. Furthermore, submissions in the record suggest that some minority media owners may be poised to pursue cross-ownership acquisition and investment opportunities. Therefore, eliminating the rule potentially could increase minority ownership of newspapers and broadcast stations.

34. In addition, the Commission rejects assertions that *Prometheus III* prevents the Commission from repealing or modifying any of its broadcast ownership rules on reconsideration. Contrary to such assertions, the Third Circuit's holding in *Prometheus III* does not require the Commission to adopt a socially disadvantaged business (SDB) definition before it can revise or repeal any rules; rather, the court simply required the Commission to complete its analysis of whether to adopt such a definition. The Commission completed that required analysis in the *Second Report and Order* and declined to adopt an SDB standard.

35. Finally, in the *Second Report and Order,* the Commission stated that the revised NBCO Rule it adopted would help promote ownership diversity. The Commission's comment, however, did not indicate a belief that the rule would promote minority and female ownership specifically, but rather that the rule would promote ownership diversity generally by requiring the separation of newspaper and broadcast station ownership. Moreover, the Commission made it clear that promoting viewpoint diversity, as opposed to preserving or promoting minority and female ownership, was the purpose of its revised rule. The record does not suggest that restricting common ownership of newspapers and broadcast stations promotes minority and female ownership of broadcast stations, and there is evidence in the record that tends to support the contrary. Thus, fostering minority and female ownership does not provide a basis to retain the rule.

## B. Radio/Television Cross-Ownership Rule

### 1. Introduction

36. The Commission grants the request for reconsideration of the Commission's decision in the *Second Report and Order* to retain the Radio/

Television Cross-Ownership Rule. Ownership of television and radio stations will continue to be limited by the Local Television and Local Radio Ownership Rules.

2. Background

37. In the *Second Report and Order,* the Commission retained the Radio/Television Cross-Ownership Rule with only minor technical modifications, finding that the rule remained necessary to promote viewpoint diversity. Despite its prior tentative conclusion to the contrary, the Commission concluded that the Radio/Television Cross-Ownership Rule remains necessary given that radio stations and television stations both contribute in meaningful ways to promote viewpoint diversity in local markets. The Commission further claimed that the rule continues to play an independent role in serving the public interest separate and apart from the Local Radio and Local Television Ownership Rules, which are designed primarily to promote competition. In its petition for reconsideration, NAB asserts that the decision in the *Second Report and Order* to retain the Radio/Television Cross-Ownership Rule (with only minor technical modifications) was arbitrary and capricious and contrary to Section 202(h) of the 1996 Act.

3. Discussion

38. On reconsideration, the Commission eliminates the Radio/Television Cross-Ownership Rule, concluding that it is no longer necessary to promote viewpoint diversity in local markets. The Commission concludes that the Commission erred in finding in the *Second Report and Order* that broadcast radio stations contribute to viewpoint diversity to a degree that justifies retention of the rule, particularly in light of other local media outlets that contribute to viewpoint diversity. The Commission also concludes that, given that the rule already permits a significant degree of common ownership, it is doing very little to promote viewpoint diversity and its elimination therefore will have a negligible effect. The record in this proceeding gives no cause to disturb the long-standing conclusion that the rule is not necessary to promote localism. However, elimination of the rule is likely to have a negligible impact in most markets, so any impact on localism—positive or negative—will be similarly negligible. Finally, the Commission finds that elimination of the rule is not likely to have a negative impact on minority and female ownership.

39. Contrary to the Commission's findings in the *Second Report and Order,* as discussed below, the Commission finds that broadcast radio stations' contributions to viewpoint diversity in local markets no longer justify retention of the Radio/Television Cross-Ownership Rule. The Commission tentatively concluded in the *NPRM* (77 FR 2867, Jan. 19, 2012, FCC 11–186, rel. Dec. 22, 2011) that the rule was no longer necessary to promote viewpoint diversity. It then sought further comment on that tentative conclusion in the *FNPRM.* The Commission's approach in the *NPRM* and *FNPRM* was based on an already robust record— which was strengthened by comments filed in response to the *FNPRM*— demonstrating that local radio stations are not primary sources of viewpoint diversity in local markets and that alternative media outlets are a growing and important source of viewpoint diversity. The Commission, however, reversed itself in the *Second Report and Order,* concluding that the rule should be retained. In doing so, the Commission largely relied on limited evidence, much of it anecdotal or immaterial, to conclude that radio contributes to viewpoint diversity in local markets to a degree sufficient to justify retention of the rule. For example, the comments cited by the Commission primarily discussed format selection, music programming, and national news content, all of which are aspects of radio programming that do not inform the Commission's viewpoint diversity analysis.

40. The Commission also discussed broadcast radio's contributions to viewpoint diversity in the NBCO rule section of the *Second Report and Order.* That discussion was equally unpersuasive. The Commission failed to demonstrate that broadcast radio stations are significant independent sources of local news, relied on statistics that failed to distinguish between local and national news content, referenced examples of broadcast content on low-power stations, and relied heavily on only a handful of anecdotes regarding broadcast radio's contributions to viewpoint diversity. The rule does not apply to low-power stations, and their contribution to diversity is unaffected by the decision to retain or repeal the radio-television cross-ownership rule. All of these flaws undermine the broad finding that broadcast radio stations contribute to viewpoint diversity to an extent that continues to justify cross-ownership regulation.

41. NAB argues that the Commission failed to justify its departure from its

position in the *NPRM* and *FNPRM* that radio stations make only limited contributions to local viewpoint diversity. The Commission agrees and find that the Commission's conclusion in the *Second Report and Order* that radio contributes to local viewpoint diversity in meaningful ways, such that it justified retention of the rule—a clear departure from its earlier, well-supported position—was not supported by the record. The Commission has long maintained that broadcast radio stations are not a primary source of viewpoint diversity in local markets. While the record indicates that broadcast radio stations may contribute to viewpoint diversity in local markets to a certain degree, the Commission finds that, in the current media marketplace, these contributions no longer justify restrictions on television/radio cross-ownership.

42. For example, the Commission itself acknowledged that consumers' reliance on radio for some local news and information has declined significantly over time—falling from 54 percent to 34 percent over the last two decades—as has the number of all-news commercial radio stations—down to 30 stations from (the already low) 50 stations in the mid-1980s out of over 11,000 commercial radio stations. Moreover, the overwhelming majority of programming on news-talk stations is nationally syndicated, rather than locally produced. Comments in the record, which the *Second Report and Order* did not address or dispute, support these findings. A Gallup poll found that only six percent of Americans turn to radio as their main news source, and a Pew study found that the percentage of Americans reporting that they got any news from radio on the previous day dropped from more than 50 percent in 1990 to 33 percent in 2012 (consistent with earlier findings cited by the Commission). Only five percent cite radio as a main source for political and arts and cultural information, four percent for crime updates, and three percent or less for information on various other topics. A 2013 Pew study confirmed the overall trend, finding that news programming had been relegated to an even smaller corner of the listening landscape. Even within this smaller universe, a substantial segment consists of National Public Radio (NPR)-affiliated noncommercial broadcast radio stations, which are not subject to the broadcast ownership limits. At present, NPR has over 900 member stations in the U.S. As discussed above, the attempt in the *Second Report and Order* to overcome

the record in this proceeding of radio's relatively minor contribution as a source of local news and the Commission's historical recognition of radio's reduced role in promoting viewpoint diversity is unpersuasive. The record supports far better the Commission's tentative conclusions in the *NPRM* and *FNPRM* regarding radio's limited contributions to viewpoint diversity in local markets.

43. In addition, the Commission finds that, as NAB contends, the Commission's decision to retain the rule did not properly acknowledge the realities of the digital media marketplace, in which consumers now have access to a multitude of information sources that contribute to viewpoint diversity in local markets. In the *Second Report and Order,* the Commission found that platforms such as the internet or cable do not contribute significantly to viewpoint diversity in local markets and therefore do not meaningfully protect against the potential loss of viewpoint diversity that would result from increased radio/ television cross-ownership. The Commission disagrees with arguments that the Commission properly found that cable and satellite programming do not meaningfully contribute to coverage of local issues and that information available online usually originates from traditional media sources. The Commission finds instead that the Commission erred in discounting the role that non-traditional sources play in the local media marketplace and that the contributions of such outlets result in greater access to independent information sources in local markets. In particular, evidence in the record clearly demonstrates the emergence of online outlets—including many unaffiliated with broadcast or print sources—that now offer local news and information. And as discussed above, the Commission finds that it failed to properly credit the local news offerings of cable operators. Even if cable and online outlets are not yet primary sources of local news and information programming, their contributions cannot be overlooked. While the Commission relied on a handful of anecdotes to overcome its earlier, compelling findings regarding broadcast radio's limited contributions to local news and information programming, it refused to give appropriate consideration to more persuasive evidence of the increasing contributions of non-traditional media—a trend the Commission had previously noted, and which has continued.

44. The decline of radio's role in providing local news and information, together with the rise of online sources,

marks a change from the circumstances the Commission faced when it upheld the rule in the *2006 Quadrennial Review Order.* Accordingly, the Commission finds that contributions to viewpoint diversity from platforms such as the internet and cable, while not primary sources of viewpoint diversity in local markets, help mitigate any potential loss of viewpoint diversity that might result from limited increases in radio/ television cross-ownership.

45. Importantly, the Commission does not mean to suggest that broadcast radio stations make no contribution to viewpoint diversity in local markets— they do. In order to continue to justify the radio/television cross-ownership limits under Section 202(h), however, the Commission is compelled to consider these contributions in the context of the broader marketplace as it exists today, in which broadcast television, print, cable, and online sources all contribute to viewpoint diversity. Broadcast radio's contributions notwithstanding, the wide selection of sources now available renders the Radio/Television Cross- Ownership Rule obsolete in today's vibrant media marketplace.

46. Moreover, the Commission finds that because the rule already permits significant cross-ownership in local markets, eliminating it will have only a minimal impact on common ownership, as parties will continue to be constrained by the applicable ownership limits in the Local Television and Local Radio Ownership Rules. For example, pursuant to the Radio/ Television Cross-Ownership Rule, in the largest markets, entities are permitted to own, in combination, either two television stations and six radio stations or one television station and seven radio stations. The Local Radio Ownership Rule permits an entity to own a maximum of eight radio stations in a single market. Therefore, in the largest markets, absent the Radio/Television Cross-Ownership Rule, an entity approaching the limits of the existing cap will be permitted to acquire only one additional radio station and remain in compliance with the Local Radio Ownership Rule. Likewise, an entity with one television station already could acquire only one additional station in these large markets under the Local Television Ownership Rule. Thus, the effect of eliminating the radio/ television cross-ownership rule will be small and, as discussed above, mitigated by contributions to viewpoint diversity from other media outlets. In addition, the local ownership limits for television and radio, while intended primarily to promote competition, will continue to

prevent an undue concentration of broadcast facilities, thereby preserving opportunities for diverse local ownership, and are therefore adequate to serve the goals the Radio/Television Cross-Ownership Rule was intended to promote.

47. In light of its limited benefits, the Commission finds that the Radio/ Television Cross-Ownership Rule no longer strikes an appropriate balance between the protection of viewpoint diversity and the potential public interest benefits that could result from the efficiencies gained by common ownership of radio and television stations in a local market, efficiencies that the Commission has previously recognized. For example, NAB cites numerous Commission studies that found that radio/television cross- ownership produces public interest benefits, including increased news and public affairs programming. The Tribune Company also provides examples of how its co-owned radio/ television combinations have been able to improve outreach to their local community and work collaboratively to improve coverage of issues of local concern. The current rule prevents localism benefits from accruing more broadly, without providing meaningful offsetting benefits to viewpoint diversity. As such, the Commission can no longer justify retention of the Radio/ Television Cross-Ownership Rule under Section 202(h). In light of the significant common ownership already allowed under the rule, it is not appropriate to modify and retain the rule, which the Commission has found is no longer in the public interest under Section 202(h). Indeed, the record demonstrates that there is no policy justification— competition, localism, or viewpoint diversity—upon which to base such a revised rule. Because the Commission is eliminating the Radio/Television Cross- Ownership Rule on the grounds discussed herein, it is not necessary to reach alternative arguments involving the impact of ownership on viewpoint diversity.

48. *Minority and Female Ownership.* Lastly, consistent with the Commission's preliminary view in the *FNPRM,* the Commission finds that the record fails to demonstrate that eliminating the Radio/Television Cross- Ownership Rule is likely to harm minority and female ownership. While broadcast radio remains an important entry point into media ownership, eliminating this rule will not result in significant additional consolidation because of the constraints of the Local Radio Ownership Rule. Furthermore, there is no evidence that any additional

common ownership that would be permitted as a result of eliminating the Radio/Television Cross-Ownership Rule would disproportionately or negatively impact minority- and female-owned stations. Indeed, the analyses within the contexts of the Local Television Ownership Rule and the Local Radio Ownership Rule suggest that previous relaxations of those rules have not resulted in reduced levels of minority and female ownership. The Commission finds that the record provides no information to suggest that eliminating the Radio/Television Cross-Ownership Rule will have a different impact on minority and female ownership. The Commission disagrees with the general assertion by UCC et al. that the Commission cannot modify any of its media ownership rules without further study of the impact on minority and female ownership.

49. In the *Second Report and Order,* the Commission found that although the rule could help promote opportunities for diversity in broadcast television and radio ownership, it was not being retained for the purpose of preserving or creating specific amounts of minority and female ownership. The Commission's comment, however, did not indicate a belief that the rule would promote minority and female ownership specifically, but rather that the rule would promote ownership diversity generally by requiring the separation of radio and television broadcasters. The Commission cannot justify retaining the rule under Section 202(h) based on the unsubstantiated hope that the rule will promote minority and female ownership.

*C. Local Television Ownership Rule*

1. Introduction

50. Upon reconsideration, the Commission finds that the Local Television Ownership Rule adopted in the *Second Report and Order* is not supported by the record and must be modified.

2. Background

51. The *Second Report and Order* effectively retained the existing Local Television Ownership Rule (with only a minor technical modification of the contour overlap provision to reflect the transition to digital broadcasting), finding that the rule remained necessary to promote competition. Despite a record replete with evidence of the significant changes in the video marketplace, the Commission's decision left in place ownership restrictions originally implemented in 1999. Under the rule adopted in the *Second Report*

*and Order,* an entity may own up to two television stations in the same market if: (1) the digital noise limited service contours (NLSCs) of the stations (as determined by section 73.622(e) of the Commission's rules) do not overlap; or (2) at least one of the stations is not ranked among the top-four stations in the market and at least eight independently owned television stations would remain in the market following the combination. NAB and Nexstar filed petitions for reconsideration of the Local Television Ownership Rule, specifically challenging the Top-Four Prohibition and the Eight-Voices Test.

3. Discussion

52. On reconsideration, the Commission adopts a revised Local Television Ownership Rule, finding that the rule adopted in the *Second Report and Order* is no longer necessary in the public interest as a result of competition. The Commission's revised rule reflects its assessment of both the current video marketplace and the continued importance of broadcast television stations in their local markets. Specifically, the Commission finds that the Eight-Voices Test is not supported by the record and must be eliminated. In addition, the Commission modifies the Top-Four Prohibition by incorporating a new case-by-case review process to address evidence in the record that the prohibition may be unwarranted in certain circumstances. The Commission finds that these modifications to the Local Television Ownership Rule are not likely to have a negative impact on minority and female ownership.

53. The Commission rejects the argument that reconsideration is inappropriate because petitioners rely on arguments that have been fully considered and rejected by the Commission within the same proceeding. Neither the Communications Act nor the Commission's rules preclude granting petitions for reconsideration that fail to rely on new arguments. Likewise, the Commission rejects UCC's claim that reconsideration is not warranted unless petitioners present new evidence. UCC's reliance on section 1.429(b) of the Commission's rules is misplaced, as this section does not *require* petitioners to support their claims of Commission error with new evidence. Commission precedent establishes that reconsideration is generally appropriate where the petitioner shows either a material error or omission in the original order or raises additional facts not known or not existing until after the

petitioner's last opportunity to respond. Even if a petition is repetitious, the Commission can, in its discretion, consider it. While the petitioners repeat some arguments made earlier in this proceeding, they nonetheless provide valid grounds for the Commission to reconsider its previous action. As discussed below, the Commission finds that the petitioners have identified material errors in the *Second Report and Order* warranting reconsideration of certain aspects of the Local Television Ownership Rule.

54. *Market.* The Commission finds that its decision in the *Second Report and Order* to adopt a rule focused on promoting competition among broadcast television stations in local television viewing markets was appropriate given the record compiled in this proceeding. The Commission concluded in the *Second Report and Order* that non-broadcast video offerings still do not serve as meaningful substitutes for local broadcast television and that competition within a local market motivates a broadcast television station to invest in better programming and to provide programming tailored to the needs and interests of the local community in order to gain market share. NAB and Nexstar urge the Commission to expand the market definition to include non-broadcast video alternatives, such as online and multichannel video programming distributors (MVPD) video programming sources. While the video marketplace has changed substantially since the current television ownership limits were adopted in 1999 and since the last Commission review of these rules concluded in 2008, broadcast television stations still play a unique and important role in their local communities. As such, the Commission believes that, on the current record, a rule focused on preserving competition among local broadcast television stations is still warranted. Thus, the Commission does not include other types of video programming providers within the market to which the restriction applies. The Commission emphasizes, however, that this conclusion could change in a future proceeding with a different record.

55. The Commission's finding does not mean, however, that changes outside the local broadcast television market should not factor into the Commission's assessment of the rule under Section 202(h) or that the Commission is free to retain its existing rule without any adjustments that take into account marketplace changes. Indeed, television broadcasters' important role makes it critical for the

Commission to ensure that its rules do not unnecessarily restrict their ability to serve their local markets in the face of ever-growing video programming options. Consumers are increasingly accessing video programming delivered via MVPDs, the internet, and mobile devices. Moreover, the online video distributor (OVD) industry—which includes entities such as Netflix and Hulu—continues to grow and evolve. In addition to providing on-demand access to vast content libraries, many OVDs are now offering original programming and/ or live television offerings similar to traditional MVPD offerings. The *Second Report and Order* acknowledged the popularity of these services but failed to properly account for this in its analysis. Accordingly, the Commission reconsidered the Local Television Ownership Rule and adopt common sense modifications that will help local television broadcasters achieve economies of scale and improve their ability to serve their local markets in the face of an evolving video marketplace.

56. *Eight-Voices Test.* Upon reconsideration, the Commission finds that the Eight-Voices Test is unsupported by the record or reasoned analysis and is no longer necessary in the public interest. Accordingly, the Commission grants the NAB Petition and the Nexstar Petition with respect to this issue.

57. Despite the fact that the Commission has spent years seeking comment regarding the local ownership rule, the record lacks evidence sufficient to support the Commission's decision to retain the Eight-Voices Test. In the *Second Report and Order,* the Commission asserted that competition among stations affiliated with the Big Four networks (often the top-four rated broadcast stations in a local market) and at least four independent competitors unaffiliated with a Big Four network motivates all of the stations in a market to improve their programming, including providing additional local news and public interest programming. Yet the Commission did not provide or cite any evidence to support this argument, even though the Eight-Voices Test has been around since 1999 (more than enough time to observe whether the Eight-Voices Test has been having the expected impact in local markets).

58. The Commission also failed to explain adequately why the number of independent television stations must be equal to the number of top-performing stations in a market. The Commission stated that a significant gap in audience share persists between the top-four rated stations in a market and the remaining stations in most markets, but it offered

no justification for the notion that the dominance of four top-performing stations must be balanced by an equal number of independent, lower-performing stations. The Commission provided no precedent, record evidence, or economic theory to support this notion. Moreover, a significant gap in audience share between the top-four stations and the other stations in a market could also logically justify permitting the common ownership of non-top-four stations to form a stronger competitor to the top-four stations and thus promote competition, even if fewer than eight independent voices remain.

59. Instead, the Commission's primary justification for retaining the Eight-Voices Test apparently stems from the historical use of the number eight as the proper number of voices when the rule was revised in 1999 to permit duopoly ownership in certain circumstances. Notably, that decision relied on viewpoint diversity grounds to determine the appropriate numerical limit. The Commission subsequently determined that the rule was no longer necessary to promote viewpoint diversity and instead relied on competition to support its adoption of the exact same voices limit in the *2006 Quadrennial Review Order.* The Commission, however, offered no empirical evidence to support this line drawing in the *2006 Quadrennial Review Order* as necessary to preserve competition, and as discussed above, the Commission finds that the rationale set forth in the *Second Report and Order* was flawed. Although the Commission's decision to retain the Eight-Voices Test in the *2006 Quadrennial Review Order* was upheld in *Prometheus Radio Project* v. *FCC,* 652 F.3d 431 (3d Cir. 2011) (*Prometheus II*), the Commission is obligated under Section 202(h) to justify its broadcast ownership rules based on the existing record and in light of current marketplace realities. On reconsideration, the Commission finds no record support for retaining the Eight-Voices Test and concludes that retaining it does not serve the public interest. Further, as discussed below, the Eight-Voices Test prevents the realization of public interest benefits. Accordingly, it must be eliminated.

60. The record fails to support the adoption of a different voice test, *e.g.,* six voices, despite specific requests for comment on alternative voice tests in this proceeding. One commenter argued for lowering the voice count in general, and another proposed changing the test to four voices—a proposal the Commission rejects because such a restriction would be redundant given its

decision, as discussed below, to retain the Top-Four Prohibition. Another commenter argued that the Eight-Voices Test should be eliminated and not replaced with an alternative test. No other commenters offered support for a different voice test. The Commission finds no justification for relying on an arbitrary voice count to promote competition and concludes that the public interest is better served by the revised rule the Commission adopts in this *Order,* which will allow combinations that will help lower-rated stations better serve their viewers while preserving the restriction that an entity may not own two top-four rated stations in a market unless it can demonstrate that such a combination will serve the public interest and in no event will allow common ownership of more than two stations in a market, subject to the contour overlap provision. The Commission finds that this is a more effective way to promote competition and still avoid harms associated with significant concentration in local markets than an arbitrary remaining voices test.

61. The Commission not only failed to provide a reasoned basis for retaining the Eight-Voices Test; it also ignored evidence in the record demonstrating that the Eight-Voices Test lacks any economic support, is inconsistent with the realities of the television marketplace, and prevents combinations that would likely produce significant public interest benefits. Indeed, no commenter has produced evidence of any other industry where the government employs an eight-competitor test. In multiple instances, the Commission acknowledged the potential public interest benefits of common ownership, which potentially allow a local broadcast station to invest more resources in news or other public interest programming that meets the needs of its local community. The Commission finds that the Eight-Voices Test denies the public interest benefits produced by common ownership without any evidence of countervailing benefits to competition from preserving the requirement. Furthermore, these markets—including many small and mid-sized markets that have less advertising revenue to fund local programming—are the places where the efficiencies of common ownership can often yield the greatest benefits. The Commission's action in repealing the Eight-Voices Test will enable local television broadcasters to realize these benefits and better serve their local markets. In particular, the record suggests that local news programming is

USCA Case #18-1071    Document #1721291    Filed: 03/07/2018    Page 20 of 33

typically one of the largest operational costs for broadcasters; accordingly, stations may find that common ownership enables them to provide more high-quality local programming, especially in revenue-scarce small and mid-sized markets. After the draft order in this proceeding was publicly released, DISH Network L.L.C. (DISH) submitted an economic study based on viewer ratings data applicable to existing combinations of local television stations as compared with ratings data from independently owned stations in DMAs deemed comparable to the DMAs served by commonly owned stations. DISH claims that the study shows that common ownership of local television stations does not produce increased ratings for local programming; therefore, common ownership does not produce higher-quality local programming. DISH provides no reason it could not have submitted this study earlier in response to broadcasters' claims that relaxation of the rule would lead to more locally responsive and higher quality programming. Thus, it is inexcusably late. 47 CFR 1.429(b), (f). Moreover, the study suffers from significant methodological issues and fails to provide a sufficient basis upon which to draw any conclusions. For example, the study employs a simplistic analysis covering a small sample size and the results are highly dependent on the selection of data points, such as control DMAs, viewing period, and time slot. Furthermore, the analysis fails to address issues of statistical significance regarding viewership, and the cross-sectional analysis fails to account for other variables that may influence viewership in different markets or otherwise address the cases in the filing for which viewership is higher in duopoly markets. Ultimately, the study does not undermine the Commission's finding that efficiencies gained through common ownership can allow broadcasters to invest more resources in producing more and higher-quality locally responsive programming.

62. *Top-Four Prohibition.* In contrast to the Eight-Voices Test, the Commission finds that its decision in the *Second Report and Order* to treat combinations of two top-four stations differently from other combinations is supported in the record. The Commission therefore denies the NAB Petition and the Nexstar Petition to the extent each requested complete elimination of the Top-Four Prohibition. As discussed below, however, the Commission finds that modification of the Top-Four Prohibition to include a case-by-case analysis is appropriate in

order to address instances in which the application of the Top-Four Prohibition may not be warranted based on the circumstances in a particular market or with respect to a particular transaction. This hybrid approach will allow for a more refined application of the Local Television Ownership Rule that will help facilitate the public interest benefits associated with common ownership in local markets.

63. The ratings data in the record generally supported the Commission's line drawing, and the potential harms associated with top-four combinations find support in the record. The Commission has repeatedly concluded that the Top-Four Prohibition is necessary to promote competition in the local television marketplace. As the Commission has consistently found, there is generally a significant cushion of audience share percentage points that separates the top four stations from the fifth-ranked stations. In the *Second Report and Order,* the Commission found that this pattern has not changed. Thus, top-four combinations would generally result in a single firm's obtaining a significantly larger market share than other stations and reduced incentives for commonly owned local stations to compete for programming, advertising, and audience shares. The Commission also finds that the data were sufficiently recent and uncontradicted by any newer ratings data in the record, such that it was appropriate for the Commission to rely on the data in reaching its decision. The Commission considered alternative arguments and data in the record and ultimately found that the Top-Four Prohibition, last endorsed in the *2006 Quadrennial Review Order,* continued to be supported. In arguing that the Top-Four Prohibition should be eliminated, NAB notes that evidence in the record demonstrated that the concerns that the Top-Four Prohibition is intended to address may not be present in many markets. NAB also provides additional information demonstrating that some markets do not have a gap between the ratings of the fourth- and fifth-ranked stations or that the gap is larger between second- and third-ranked stations in some markets. The Commission has long conceded that the justification for the Top-Four Prohibition does not apply in all markets. Thus, the rule may prohibit combinations that do not present public interest harms or that offer potential public interest benefits that outweigh any potential harms. To this extent, the bright-line prohibition is over-inclusive. On reconsideration, the Commission believes that it is

appropriate to modify the rule to allow for more flexibility.

64. In particular, the Commission takes steps to mitigate the potentially detrimental impacts of applying the Top-Four Prohibition in certain circumstances. In the *Second Report and Order,* the Commission conceded the potential public interest benefits from allowing additional common ownership, yet found that the harms associated with top-four combinations exceeded these benefits. This logic no doubt holds when the rationale for adopting the Top-Four Prohibition applies, though the benefits could exceed the harms in certain circumstances based on an evaluation of the characteristics of a particular market or a particular transaction.

65. Instead of relying solely on the bright-line application of the Top-Four Prohibition, the Commission is adopting a hybrid approach that will allow applicants to request a case-by-case examination of a proposed combination that would otherwise be prohibited by the Top-Four Prohibition. Under a hybrid approach, a rule includes both bright-line provisions and a case-by-case element to allow for consideration of market-specific factors. Such an approach provides certainty and flexibility when determining whether a particular transaction should be granted. Though no party commented on this issue, the Commission finds that the record supports its approach. As discussed in this *Order,* special scrutiny of combinations of two top-four rated stations is still supported by the record, though the record also demonstrates a need for flexibility in addressing circumstances in which application of the Top-Four Prohibition may not be appropriate due to the particular circumstances in a local market. The hybrid approach is well suited for such circumstances. Such an approach will help mitigate the potential drawbacks associated with strict application of the Top-Four Prohibition, while still preserving the ease and efficiency of applying the rule. This revised rule will continue to promote robust competition in local markets while also facilitating transactions, in appropriate circumstances, that will allow broadcast stations to achieve economies of scale and better serve their local viewers.

66. As the Commission has just discussed, the record demonstrates the need for flexibility in the application of the Top-Four Prohibition. Given the variations in local markets and specific transactions, however, the Commission does not believe that applicants would be well served by a rigid set of criteria for its case-by-case analysis. The record

does, however, suggest the types of information that applicants could provide to help establish that application of the Top-Four Prohibition is not in the public interest because the reduction in competition is minimal and is outweighed by public interest benefits. Such information regarding the impacts on competition in the local market could include (but is not limited to): (1) Ratings share data of the stations proposed to be combined compared with other stations in the market; (2) revenue share data of the stations proposed to be combined compared with other stations in the market, including advertising (on-air and digital) and retransmission consent fees; (3) market characteristics, such as population and the number and types of broadcast television stations serving the market (including any strong competitors outside the top-four rated broadcast television stations); (4) the likely effects on programming meeting the needs and interests of the community; and (5) any other circumstances impacting the market, particularly any disparities primarily impacting small and mid-sized markets. Applicants are encouraged to provide data over a substantial period (*e.g.,* the past three years, similar to the requirement in the failing/failed station waiver test) to strengthen their request and to help avoid circumvention of the Top-Four Prohibition based on anomalous data over a short period of time or manipulation of program offerings prior to the proposed transaction. In the end, applicants must demonstrate that the benefits of the proposed transaction would outweigh the harms, and the Commission will undertake a careful review of such showings in light of the record with respect to each such application.

67. The Commission disagrees with the contention that affording licensees a case-by-case opportunity to seek approval of top-four combinations cannot be squared with the bright-line rule adopted in the Commission's *2014 Retransmission Consent Report and Order* (79 FR 28615, May 19, 2014, FCC 14–29, rel. Mar. 31, 2014). There, the Commission concluded that the potential competitive harms arising from joint negotiation of retransmission consent by non-commonly owned stations outweighed the potential benefits and determined that a bright-line prohibition would be more administratively efficient than case-by-case review because it would provide the bargaining parties with advance notice of the appropriate process for such negotiation. Here, however, the

result of the Commission's case-by-case review of proposed top-four combinations will provide bargaining parties with advance notice of whether joint retransmission consent negotiations for the two stations in question will be allowed. Moreover, common ownership of two top-four stations implicates a broader range of potential benefits and harms than a narrow agreement between two top-four stations to jointly negotiate retransmission consent so there is no inherent inconsistency between adopting a bright-line rule in the latter case and a case-by-case review in the former case. Additionally, the Commission rejects the contention that adopting a case-by-case review is inconsistent with the statute. To the extent that the existing Top-Four Prohibition is overbroad given the current state of competition, as the Commission concludes here, then the existing prohibition, absent modification, is not necessary in the public interest as a result of competition and should be modified. Moreover, in adopting this approach, the Commission declines to adopt specific criteria related to the issue of retransmission consent, as recently advocated by some commenters. Instead, as discussed in this *Order,* the Commission believes that the case-by-case review process will allow parties to advance any relevant concerns—including concerns related to retransmission consent issues—in the context of a specific proposed transaction if such issues are relevant to the particular market, stations, or transaction.

68. Similarly, the Commission rejects the recommendation of Independent Television Group (ITG) that the Commission adopt a presumption in favor of top-four combinations in small and mid-sized markets. ITG provides no evidence sufficient to support such a presumption. ITG simply relies on NAB's assertion in its 2014 comments that in some markets, there may have been significant disparities in audience share among some of the top-four rated stations. The case-by-case analysis is not weighted in favor of transactions in any particular market, and applicants in small and mid-sized markets will be able to provide market-specific evidence supporting their requests.

69. Gray Television, Inc. proposes that, at least in smaller markets, two stations is permitted to combine ownership if one of the stations has not produced a local newscast in the previous two years. The Commission finds, however, that market characteristics and the state of local programming, including local news

offerings, are better considered in its case-by-case analysis at this time. The Commission anticipates that any transactions processed under this case-by-case approach will help inform any consideration of specific criteria that could be included in any future revision of the Local Television Ownership Rule, which will be reviewed again in the forthcoming 2018 Quadrennial Review proceeding.

70. *Minority and Female Ownership.* The Commission finds that the modifications adopted to the Local Television Ownership Rule are not likely to harm minority and female ownership. As noted in the *Second Report and Order,* data in the record demonstrate that relaxation of the Local Television Ownership Rule in 1999 did not have a negative impact on overall minority ownership levels. In this lengthy proceeding, no party has presented contrary evidence or a compelling argument demonstrating why relaxing this rule will have a different impact. Indeed, consistent with the *Second Report and Order,* the Commission finds that the record does not support a causal connection between modifications to the Local Television Ownership Rule and minority and female ownership levels.

71. In the *Second Report and Order,* the Commission stated that ensuring the presence of independently owned broadcast television stations in the local market indirectly increases the likelihood of a variety of viewpoints and preserving ownership opportunities for new entrants. The Commission's comment, however, did not indicate a belief that the rule would promote minority and female ownership specifically, but rather that the rule would promote ownership diversity generally by limiting common ownership of broadcast television stations. This statement will continue to be true with respect to the revised rule that the Commission adopts in this *Order.* Under Section 202(h), however, the Commission cannot continue to subject broadcast television licensees to aspects of the Local Television Ownership Rule that can no longer be justified based on the unsubstantiated hope that these restrictions will promote minority and female ownership. In addition, the Commission disagrees with the general assertion by UCC et al. that the Commission cannot modify any of its media ownership rules without further study of the impact on minority and female ownership. The Commission also disagrees with assertions by the Multicultural Media, Telecom and internet Council and the National Association of Black Owned

USCA Case #18-1071    Document #1721291    Filed: 03/07/2018    Page 22 of 33

Broadcasters that the rules can be retained based on promoting news coverage of specific issues.

72. *Incentive Auction.* The Commission reiterates that it remains premature to analyze the implications of the incentive auction on the Local Television Ownership Rule. Contrary to the position of certain parties, the Commission cannot—and did not in the *Second Report and Order*—use the auction as an excuse for delaying action and refusing to fulfill its obligations under Section 202(h). While the Commission finds fault in its prior decision to retain the existing television ownership restrictions without modification, the incentive auction was not a factor in that decision. Instead, the Commission properly found that it could not delay a decision on its rules because of the auction nor could it adopt changes to its rules based on speculation as to the final results of the auction. The Commission agrees with its prior finding. Section 202(h) compels the Commission to act on the record before it and determine whether to retain, repeal, or modify the Local Television Ownership Rule based on the realities of the current marketplace, which the Commission has done. Though the auction has finished, it is still too soon to evaluate its impacts on the television marketplace. While there is still time for stations to change their post-auction channel sharing elections, the initial results of the auction suggest that the auction may not have a significant impact in the context of the Local Television Ownership Rule, as the overwhelming majority of commercial, full-power winning bidders have elected to channel share once they surrender their spectrum. The Commission will continue to monitor these elections as part of its continuing efforts to assess the impact of the auction on the television marketplace. As noted in the *Second Report and Order,* the Commission will evaluate the broadcast marketplace post-auction and expects that these issues will be considered in the forthcoming 2018 Quadrennial Review proceeding.

*D. Local Radio Ownership Rule*

1. Introduction

73. The Commission denies in part and grants in part Connoisseur's petition for reconsideration of the Commission's decision in the *Second Report and Order* to retain the current methodology for determining compliance with the Local Radio Ownership Rule in markets containing embedded markets (*i.e.,* smaller markets, as defined by Nielsen Audio,

that are included in a larger parent market). The Commission grants Connoisseur's petition to the extent it seeks a presumption that would apply its two-prong test for waiver requests involving existing embedded markets with multiple embedded markets pending further consideration of this issue in the 2018 Quadrennial Review proceeding.

2. Background

74. Connoisseur seeks reconsideration of the decision in the *Second Report and Order* to retain the existing methodology for embedded markets and asks the Commission to adopt a new two-pronged test for a station owner that seeks to own stations licensed to home counties (*i.e.,* the county in which the station's community of license is geographically located) in different embedded markets within a single parent market. Consistent with the Commission's current methodology, under the first part of Connoisseur's proposed test, a station owner would be required to comply with the numerical ownership limits using the Nielsen Audio Metro methodology in each embedded market. Under the second part, however, the station owner would be required to comply with the ownership limits using a contour-overlap methodology in lieu of the Commission's current parent market analysis. Connoisseur argues that, as a result of the Commission's existing methodology, a broadcaster which owns stations in one embedded market may be precluded from owning stations in another embedded market, despite the lack of competitive overlap between those markets.

3. Discussion

75. The Commission denies in part and grants in part Connoisseur's petition for reconsideration. First, the Commission finds that its decision to not adopt a blanket change to the current methodology was supported by a reasoned explanation. Second, the Commission finds that its decision to adopt a contour-overlap methodology for the Puerto Rico market is not at odds with the approach the Commission took regarding embedded markets. Finally, the Commission grants Connoisseur's alternative request to adopt a presumptive waiver approach for existing parent markets with multiple embedded markets.

76. The Commission finds that it provided a reasoned explanation for its decision in the *Second Report and Order* to not adopt a blanket change to the current embedded market methodology. Connoisseur argues that the Commission acted arbitrarily in

deciding to retain the current methodology. In particular, Connoisseur maintains that counting stations from multiple embedded markets for purposes of calculating compliance with the numerical limits in the parent market is unreasonable because stations in embedded markets do not compete in any meaningful way with stations in other embedded markets or stations in the central city of the parent market. The Commission noted in the *Second Report and Order,* it has long relied on Nielsen Audio's market analysis, as reported by BIA, which lists all the stations that are deemed to compete in a given market (often referred to as above-the-line stations), as the basis for multiple ownership calculations for embedded and parent markets. The Commission found that the Nielsen-defined markets are the primary means by which broadcasters and advertisers place a value on advertising sold by stations listed as participating in the market. Nielsen Audio's market definitions are recognized as the industry standard and provide for consistency and ease of application in comparison to other possible methods for defining local radio markets. The inclusion of an embedded market station as an above-the-line station in a parent market therefore has long been thought to reflect a determination by Nielsen Audio that, absent other information, the station competes in that market. The Commission notes that its continued reliance on Nielsen Audio market definitions for purposes of applying the Local Radio Ownership Rule provides an important level of certainty to radio licensees in all markets, including those in embedded markets, and overcomes disadvantages associated with the contour-overlap approach. Although Nielsen has historically defined what stations compete in a market based on geographical market boundaries, and the Commission's rules have relied on these determinations in determining compliance with its ownership caps, Connoisseur's Oct. 30, 2017 *ex parte* letter raises issues related to embedded markets that should be further explored in greater detail in the 2018 Quadrennial Review proceeding. However, the arguments in the *ex parte* letter support adoption of a presumptive waiver approach for transactions involving existing parent markets with multiple embedded markets.

77. The Commission also finds that its decision in the *Second Report and Order* to adopt a contour-overlap methodology for the Puerto Rico market is not inconsistent with the approach to

embedded markets. Connoisseur argues that parent markets containing multiple embedded markets are analogous to the Puerto Rico market where mountainous topography, as opposed to a central city, separates smaller centers of economic activity within the larger parent market. Accordingly, Connoisseur asserts that the contour-overlap methodology the Commission applies to the Puerto Rico market likewise should be applied in the context of embedded markets in lieu of the Commission's current parent market analysis. The Commission finds that differences between the Puerto Rico market and a parent market that includes embedded markets make the comparison between the two circumstances inappropriate. As one example, the core location of a station's listenership has the potential to shift geographically over time in a parent/ embedded market scenario in a way that would be unlikely, or even impossible, where, as in Puerto Rico, the physical terrain prevents a station from reaching other geographic areas. Indeed, the Commission has long stated that the Puerto Rico market is unique, even as compared to other large metro areas. The Commission has a long history— dating back to 2003—of applying the contour-overlap methodology to Puerto Rico on a case-by-case basis due to the unique characteristics of that market. The Commission therefore finds that its decision to retain the existing methodology for embedded markets is not undermined by its decision to adopt a contour-overlap methodology in Puerto Rico.

78. For these reasons, the Commission continues to find that, rather than adopting Connoisseur's proposal for an across-the-board change to the Commission's embedded market methodology, entertaining a market-specific waiver is the appropriate approach at this time. In the *Second Report and Order,* the Commission acknowledged Connoisseur's concerns with respect to the particular characteristics of the current New York market and indicated its willingness to entertain a waiver specific to that market, a willingness the Commission reiterates in this *Order.* Ultimately, the issue continues to appear narrow in scope—largely specific to a small number of parties' concerns with at most two markets. The circumstances Connoisseur describes could apply currently to, at most, two markets—New York City and Washington, DC. The Commission notes, however, that embedded market designations are subject to change, with the potential for embedded markets to be created,

modified, or eliminated in the future. For instance, in addition to New York and Washington, DC, Connoisseur previously had identified San Francisco as an example of a parent market with two embedded markets. One of those embedded markets, however, is no longer rated by Nielsen. Accordingly, the San Francisco market now includes only one embedded market and is therefore no longer relevant to the issues discussed in Connoisseur's petition, which pertain solely to parent markets containing multiple embedded markets. As such, the potential impact of a proposed transaction involving embedded market stations may vary based on the specific markets, stations, and ownership interests involved.

79. Accordingly, the Commission finds Connoisseur's argument regarding a presumptive waiver approach to be persuasive. While a bright-line rule codifying Connoisseur's preferred approach to embedded markets would no doubt provide greater certainty, as discussed in this *Order,* the Commission does not believe that such an approach is supported by the record at this time. Instead, the Commission intends to fully examine its existing methodology regarding embedded market transactions in the forthcoming 2018 Quadrennial Review proceeding. Pending the outcome of this review, however, the Commission adopts a presumption in favor of applying Connoisseur's two-prong test proposed on reconsideration to waiver requests involving existing parent markets with multiple embedded markets (*i.e.,* New York and Washington, DC). The Commission finds that there is sufficient evidence on the record to support a presumption that a waiver of the Local Radio Ownership Rule as to stations in these markets serves the public interest if the transaction at issue satisfies the two-prong test. Pursuant to section 310(d) of the Communications Act, the Commission must make a public interest determination with respect to any future applications based on the entire record with respect to that application. Throughout the proceeding, Connoisseur has provided information demonstrating that, due to the particular circumstances in these markets, applying the existing market methodology may not be warranted. These showings provide the Commission with sufficient confidence that transactions consistent with this presumption likely will not unduly impact competition in these markets, subject to the Commission's review under section 310(d). The Commission finds, however, that it is appropriate to

limit the presumption to these markets (New York and Washington, DC), pending review in the 2018 Quadrennial Review proceeding, to avoid any potential manipulation of embedded markets in other Nielsen Audio markets.

80. Adoption of this presumption will give Connoisseur—and other parties— sufficient confidence with which to assess possible future actions. Further, the Commission anticipates that any such transactions will help inform its subsequent review of the Local Radio Ownership Rule—and, in particular, the treatment of embedded market transactions.

*E. Television JSA Attribution*

1. Introduction

81. On reconsideration, the Commission finds that it erred in its decision to adopt the Television JSA Attribution Rule and eliminates the Television JSA Attribution Rule. The petitioners also argue that the attribution decision must be reversed on the grounds that (1) the decision had the effect of tightening the media ownership rules, and that the Commission failed to properly analyze the impact of the attribution decision as required under Section 202(h) of the 1996 Telecommunications Act; and (2) the decision was inconsistent with the Commission's repeal of the wireless attributable material relationship (AMR) rule. Because the Commission is reversing its decision to adopt the Television JSA Attribution Rule on other grounds, it does not need to reach these arguments.

2. Background

82. The Commission first considered whether to attribute television JSAs in 1999. It declined to do so, finding that JSAs did not convey a sufficient degree of influence or control over station programming or core operations to warrant attribution and that JSAs helped produce public interest benefits. The Commission sought additional comment on this conclusion in a 2004 notice of proposed rulemaking after attributing radio JSAs in the *2002 Biennial Review Order.* Then in 2014, nearly a decade after initially seeking comment on the issue, the Commission changed course and adopted the Television JSA Attribution Rule, despite a lack of evidence suggesting that its prior determination that television JSAs do not convey sufficient influence or control to warrant attribution was wrong. Specifically, the rule established that JSAs that involve the sale of more than 15 percent of the weekly advertising time of a station (brokered

station) by another in-market station (brokering station) are attributable under the Commission's ownership rules. As a result, the brokering station was deemed to have an attributable interest in the brokered station, and the brokered station would count toward the brokering station's permissible ownership totals.

83. In the *Second Report and Order,* the Commission concluded that the Local Television Ownership Rule (with a minor modification) still served the public interest and it re-adopted the Television JSA Attribution Rule based on the same rationale articulated in the *Report and Order* (79 FR 28996, May 20, 2014, FCC 14–28, rel. Apr. 15, 2014). By their Petitions, NAB and Nexstar now seek reconsideration of the decision to re-adopt the Television JSA Attribution Rule, arguing that the Commission, in adopting the rule, ignored the evidence before it and reached a decision unsupported by the record.

3. Discussion

84. The Commission finds that Petitioners provide valid reasons to reconsider the Commission's decision to adopt the Television JSA Attribution Rule. The Commission's attribution analysis was deficient and failed to adequately consider the record, which does not support the Commission's conclusion that television JSAs confer on the brokering station a sufficient degree of influence or control over the core operating functions of the brokered station to warrant attribution. In addition, the record contains ample evidence of the public interest benefits that these JSAs provide. Even if the Commission had correctly determined that television JSAs involving more than 15 percent of the brokered station's weekly advertising time confer sufficient influence to warrant attribution, the Commission concludes that the potential benefits of television JSAs outweigh the public interest in attributing such JSAs. Accordingly, the Commission grants the NAB Petition and the Nexstar Petition with respect to this issue. As a result of the Commission's decision, 47 CFR 73.3613(d)(2) and the notes to 47 CFR 73.3555 will be amended to reflect the fact that television JSAs are no longer attributable. Additionally, various Commission rules will need to be revised to reflect the other rule changes and decisions adopted in this *Order,* as set forth in the final rules. The Commission directs the Media Bureau to make all form modifications and to take any other steps necessary to implement all the rule changes and other relevant decisions adopted in this

*Order.* Though television JSAs will no longer be attributable as a result of the amount of advertising time brokered, the Commission reminds licensees that they must retain ultimate control over their programming and core operations so as to avoid the potential for an unauthorized transfer of control or the existence of an undisclosed or unauthorized real party in interest.

85. The Commission failed to demonstrate that television JSAs confer a sufficient degree of influence or control so as to be considered an attributable ownership interest under the Commission's ownership rules. While the Commission pointed out that the attribution analysis traditionally seeks to identify interests that provide the holder with the incentive and ability to influence or control the programming or other core operational decisions of the licensees—an inquiry that often relies on the Commission's predictive judgement—the Commission may not ignore the record or the realities of the marketplace when making this determination.

86. Here, the Commission's theory of attribution—a reversal of its earlier decision that television JSAs should not be attributable—was belied by its own extensive experience reviewing and approving television JSAs. Between 2008 and the decision to attribute television JSAs in 2014, the Commission's Media Bureau reviewed and approved 85 television JSAs in the context of transaction reviews. Given the Commission's extensive history reviewing specific television JSAs, it is telling that the record was devoid of any evidence that any JSA allowed a brokering station to influence even a single programming decision of a brokered station.

87. As Nexstar points out, the Commission's only citation in support of the theory that television JSAs might provide some measure of influence or control was inapposite. In *Ackerley Group, Inc.,* 17 FCC Rcd 10828 (2002), the Commission found that a combination of agreements, which included a flat-fee television JSA, were substantively equivalent to an attributable local marketing agreement (LMA). Yet the Commission's attribution analysis in the *Report and Order* relied solely on the sale of advertising time and not a combination of other agreements that may justify attribution under the Commission's rules and precedent. As such, this isolated incident failed to provide support for the Commission's theory of attribution.

88. The Commission attempted to sidestep the lack of evidence to support

its theory of attribution by relying on the decision in the *2002 Biennial Review Order* to attribute radio JSAs. The Commission now agrees with Nexstar that this reliance was not appropriate. First, the Commission failed to explain why differences in fee structure (typically fixed fees for radio JSAs versus a percentage of advertising revenue for television JSAs) did not mitigate the Commission's earlier concerns that a fixed fee structure— which the Commission found to be common in radio JSAs—effectively transferred the market risk to the brokering station. In a percentage fee structure, the broker and brokering stations split revenues based on agreed upon percentages. By contrast, a flat fee structure provides a payment to the brokered station regardless of performance or revenues. The Third Circuit relied on this finding when upholding the decision to attribute radio JSAs, and the Commission also emphasized the fixed fee structure when it proposed to attribute television JSAs in 2004. The record shows, however, that television JSAs generally rely on percentage fee arrangements in which the brokered station retains a substantial portion of the advertising revenue, which makes it substantially less likely that the brokered station's programming decisions would be significantly influenced by the brokering station. This critical difference, however, was simply glossed over without an explanation as to how a percentage fee structure transferred market risk to the brokering station in the same way as a fixed fee structure. Indeed, it appears that the typical revenue split gives the licensee of the brokered station a significant interest in the operation and success of the station that is not present in a fixed fee arrangement. While the Commission declines to attribute television JSAs for the reasons set forth in this *Order,* it notes that, under *Ackerley,* the Commission could still find that the terms of an individual television JSA (either alone or in conjunction with other agreements) rise to the level of attribution.

89. The Commission also failed to consider sufficiently other distinctions between the television market and the radio market that undermined its reliance on the radio JSA attribution precedent. For example, unlike radio stations, television stations typically have network affiliations, which limits the amount of programming that a brokering station could potentially influence and the amount of available advertising time for sale. In the Commission's experience reviewing

television JSAs in transaction reviews, most of the television JSAs approved by the Commission involved the brokering of stations with network affiliations. To be sure, the Commission disagreed that this is a meaningful distinction, but once again, it failed to provide any record evidence to support its theory. The Commission claimed that, even with a network affiliation in place, the broker could potentially influence the selection of non-network programming, whether to preempt network programming, and/or the choice of network affiliation. This claim, however, was not supported with any evidence of such influence being exerted, neither over individual programming decisions nor the selection of a network affiliation.

90. The Commission similarly brushed aside evidence that television stations rely less on local advertising revenue than radio stations, which would reduce the amount of advertising time sold by the broker. Accordingly, the broker would control less of the television station's advertising revenue, which would limit the ability and incentive of the broker to exert significant influence or control over the brokered station's core operating procedures. The Commission summarily concluded that because both radio JSAs and television JSAs involve the sale of advertising time, both must be treated the same for attribution purposes. But this one-size-fits-all attribution analysis is not supported by the record and cannot be sustained.

91. The lack of evidence supporting the Commission's determination that television JSAs confer a significant degree of influence or control over the core operating functions of the brokered station provides sufficient reason for the Commission to eliminate the Television JSA Attribution Rule. But even if the Commission had appropriately determined that television JSAs meet the attribution criteria, it still should have evaluated whether the public interest would be served by making the agreements attributable. While the Commission did acknowledge the potential for benefits flowing from the use of television JSAs in the *Report and Order,* the Commission expressly refused to consider these public interest benefits in the context of its attribution decision, claiming that the public interest benefits should be considered in the context of its analysis of the local ownership rules. While declining to evaluate the significant record evidence of the public interest benefits produced by television JSAs, the Commission claimed that it would preserve beneficial television JSAs through a

waiver process. That process, however, proved to be illusory, as the Commission did not grant a single waiver request while the Television JSA Attribution Rule was initially in effect, which ultimately led to Congressional action to protect existing television JSAs. As discussed in this *Order,* the Commission finds that the record does not support attribution of television JSAs in the first instance, so there is no need to consider whether to adopt a waiver process

92. The Commission was correct that the potential public interest benefits of television JSAs are not relevant to whether these agreements satisfy the Commission's general attribution criteria (*i.e.,* whether they confer the potential for significant influence), but that does not excuse the Commission from assessing the record to determine whether, if the attribution criteria are satisfied, attribution would serve the public interest. Notably, when the Commission attributed radio JSAs in the *2002 Biennial Review Order,* it did undertake such an assessment and found that the balance of interests, in those particular circumstances, supported the decision to attribute radio JSAs. That finding was based on the record in that proceeding, which did not contain significant or detailed evidence of the claimed public interest benefits of radio JSAs, and does not control the Commission's analysis of the potential benefits of television JSAs.

93. Additionally, in the *Second Report and Order,* which reinstated the Television JSA Attribution Rule, the Commission included only a brief, general discussion of the rationale for attributing television JSAs, largely ignoring the benefits of television JSAs. The Commission failed to discuss the voluminous record regarding the benefits produced by JSAs, instead citing anecdotal evidence that attribution of television JSAs—prior to being vacated by the Third Circuit—had produced opportunities for minority and female ownership. Its sole citation for this proposition, however, was a blog post authored by then-Chairman Tom Wheeler and Commissioner Mignon Clyburn. This claimed benefit is not supported by the record and, in fact, there is record evidence that refutes this assertion. This cursory treatment does not constitute an assessment of the record regarding the potential public interest benefits of television JSAs. As such, the Commission is not persuaded by the arguments that it properly weighed the public interest benefits before implementing this new rule. The American Cable Association (ACA) argues that eliminating the Television

JSA Attribution Rule will allow broadcasters to covertly coordinate their retransmission consent negotiations in contravention of the joint negotiation prohibition. This argument is not persuasive. Broadcasters are prohibited from jointly negotiating retransmission consent for stations in the same local market that are not under common *de jure* control permitted by the Commission. Licensees are expected to comply with the Communications Act and Commission rules and policies, and the Commission has authority to take enforcement action where it finds a licensee has violated any relevant statutes, rules, or policies. The Commission will not assume that licensees will violate its rules, but entities can file a complaint if they believe that any broadcaster is violating the joint negotiation prohibition, and the Commission will take appropriate action.

94. On reconsideration, the Commission concludes that the record demonstrates that television JSAs can promote the public interest, and that this provides an independent reason for eliminating the Television JSA Attribution Rule. Indeed, the record demonstrates that television JSAs have created efficiencies that benefit local broadcasters—particularly in small- and medium-sized markets—and have enabled these stations to better serve their communities. The video marketplace is changing rapidly, and television JSAs can help reduce costs and attract vital revenue at a time of increasing competition for viewership. Broadcasters can turn these efficiencies into increased services for local communities. For example, a JSA between two stations in Kansas helped create cost savings that, in turn, allowed the stations to fund weather emergency-related crawls in Spanish, a service vital to the tornado-prone area. Other stations have been able to increase their local news programming and further invest in investigative reporting due to their JSAs. Additionally, certain JSAs have helped spur minority ownership. As noted in the record, a station owned by Tougaloo College, a historically African-American college, has credited its JSA for providing the resources necessary to upgrade to HD, to produce content relevant to its community, and to cover local sporting events. This is just a sampling of the many examples in the record in which JSAs have benefited local stations and communities.

95. Furthermore, the Commission failed to cite any evidence of actual harm associated with television JSAs. The Commission's analysis here under the public interest standard does not

supersede any antitrust analysis performed by the Department of Justice Antitrust Division (DOJ) on a case-by-case basis regarding JSAs or other agreements among broadcasters that are similar in function. Indeed, the Commission's public interest analysis differs from DOJ's antitrust review, reflecting a broader evaluation of the potential harms and benefits of ownership combinations in light of the requirements of the Communications Act and Commission rules and the objectives of the Act and rules. Consequently, nothing in this Order, or any amendment made by this Order, should be construed to modify, impair, or supersede the operation or applicability of any state or federal antitrust laws.

96. The Commission stated that JSAs could, *possibly,* allow the stations to raise their advertising rates above what could be achieved if the ad time were sold independently. The Commission, however, failed to engage in any actual analysis of the impact of television JSAs on advertisers, and the record in this proceeding contained no evidence of stations charging higher rates for advertising sold pursuant to a JSA and no support from advertisers for the Television JSA Attribution Rule. On the contrary, there was evidence in the record that advertisers have benefitted from JSAs, which make their ad buys more efficient. Similarly, the Commission did not identify a single instance of harm to viewers or competition in local markets resulting from a broker's exercise of influence over the programming or other core operations of a brokered station—indeed, as discussed above, the Commission did not cite a single instance of such influence even being exerted.

97. The Commission finds that, on balance, the public interest is best served by *not* attributing television JSAs, regardless of whether they technically satisfy the attribution criteria. As discussed above, the Commission's attribution analysis was not supported by the record, and this failure provides an independent reason for eliminating the Television JSA Attribution Rule. It is well within the Commission's authority to decline to attribute an agreement or relationship that might otherwise satisfy the attribution criteria in order to help foster public interest benefits. For example, in the *EDP Attribution Modification Order* (73 FR 28361, May 16, 2008, FCC 07–217, rel. Mar. 5, 2008), the Commission modified the Equity/Debt Plus Attribution Rule (EDP Rule) by carving out an exemption in certain

circumstances to encourage investment in eligible entities. There, the record demonstrated that small businesses, including those owned by minorities and women, were having difficulty obtaining financing. The Commission acknowledged the potential role that the EDP Rule had in hindering investment in eligible entities and found that it was justified in relaxing the EDP Rule to help address this issue. This decision demonstrates the need to balance the purpose of the attribution rules—that is, to identify potentially influential interest holders—with the Commission's public interest goals.

98. Similarly, even if some television JSAs were to provide the brokering station some ability to influence the operations of the brokered station, the Commission finds that attribution is not warranted here in light of the significant public interest benefits produced by these agreements. Television JSAs can help promote diverse ownership and improve program offerings, including local news and public interest programming, in local markets. While the Commission agrees that it is important that its attribution rules reflect accurately the competitive conditions of local markets, particularly in the context of the Commission's local broadcast ownership rules, the analysis cannot end there. The Commission must ensure that its attribution decisions do not harm the very markets that the attribution rules are designed to protect by preventing the accrual of significant public interest benefits. As discussed in this *Order,* the tangible benefits of television JSAs far outweigh the benefits that may accrue from a rote application of the attribution criteria in these circumstances.

99. The Commission also finds that its decision to eliminate the Television JSA Attribution Rule is appropriate, even in light of its decision to relax the Local Television Ownership Rule. As discussed above, the Commission finds that it failed to establish that television JSAs confer significant influence warranting treating JSAs as attributable ownership interests, so the existence of television JSAs in the marketplace does not have an impact on the Commission's public interest analysis in the Local Television Ownership Rule context. Indeed, television JSAs have been utilized by many broadcasters with increasing prevalence for well over a decade. The record in this proceeding lacks any evidence of public interest harm, and there is evidence that these agreements have produced and can produce meaningful public interest benefits. As such, the Commission does not believe that the Local Television

Ownership Rule should be made more restrictive due to the presence of television JSAs.

100. And while there may be fewer television JSAs executed moving forward because of the Commission's relaxation of the Local Television Ownership Rule, that does not diminish the public interest benefits associated with these agreements in the television context. The television ownership limits are still much more restrictive than the radio ownership limits, so there may be a continuing need for JSAs to help create economies of scale and improve program offerings, particularly for small or independent station owners. By preserving the ability to enter into a JSA, some station owners may be able to maintain independent operations instead of exiting the marketplace, and these agreements will continue to be available to help new entrants and small businesses acquire and operate new stations. Thus, the Commission is not persuaded that repeal of the eight-voices requirement and the Television JSA Attribution Rule will deter new entry based on consolidation of advertising sales.

*F. Shared Service Agreements*

1. Introduction

101. The Commission upholds its decision in the *Second Report and Order* to adopt a comprehensive definition of SSAs and a requirement that commercial television stations disclose SSAs by placing them in their online public inspection files.

2. Background

102. SSAs allow stations in a local market to combine certain operations, personnel, and/or facilities, with one station effectively performing functions for multiple, independently owned stations. The *FNPRM* proposed a comprehensive definition of SSAs and sought comment on the scope of the definition, including any potential refinements to the definition to help ensure that it was not overbroad. While certain commenters expressed concerns with the scope of the definition, none provided an alternative definition or suggested any specific changes to the definition proposed in the *FNPRM*. The *FNPRM* also sought comment on potential disclosure options for these agreements. In the *Second Report and Order,* the Commission adopted a definition of SSAs substantially similar to the definition proposed in the *FNPRM* and a requirement that commercial television stations disclose SSAs by placing them in their online public inspection files. In its Petition for

Reconsideration, NAB asks the Commission either to eliminate the SSA disclosure requirement or rationally define the SSAs subject to it, asserting that the SSA disclosure requirement is overbroad and unnecessary.

3. Discussion

103. The Commission declines to reconsider the SSA definition and disclosure requirements adopted in the *Second Report and Order.* The Commission finds that both the definition and the disclosure requirement were supported by the record and that NAB has failed to provide sufficient reasons to reconsider the Commission's decision at this time; therefore, the Commission denies the NAB Petition in this regard.

104. Contrary to NAB's claim, the *Second Report and Order* rationally defines SSAs. In the *Second Report and Order,* the Commission adopted a clear definition of SSAs and addressed commenters' concerns regarding the types of agreements covered by the definition. As the Commission discussed, the definition of SSAs is appropriately limited in scope, applying only to those agreements that involve station-related services. Moreover, the Commission sufficiently illustrated this scope by providing guidance in the definition of SSAs with non-exhaustive examples. The *Second Report and Order* also addressed specific concerns in the record, clarifying that certain agreements, such as ad hoc or on-the-fly arrangements during breaking news coverage, fall outside the SSA definition. Ultimately, the definition is appropriately tailored to include only those agreements that involve station operations relevant to the public. NAB expresses concern that the SSA definition would apply to agreements encompassing everything from janitorial to catering to maintenance to security services. An agreement to share facilities and station personnel meeting the definition of an SSA may include provisions allocating costs or responsibilities related to the operation and upkeep of the shared facilities. Consistent with the *Second Report and Order,* however, agreements that relate only to such incidental services, even those involving shared facilities, are not encompassed by the SSA definition and are not, therefore, subject to disclosure. Accordingly, the Commission finds NAB's concerns to be misplaced and sufficiently addressed in the *Second Report and Order.* In light of the Commission's analysis and the lack of any alternative definitions or specific refinements proposed in the record, including on reconsideration, the

Commission finds no reason to reconsider the definition of SSAs adopted in the *Second Report and Order.*

105. The Commission also finds that the *Second Report and Order* provided a sufficient justification for requiring the disclosure of SSAs. The Commission is not required to first determine the regulatory status of SSAs before requiring disclosure. The *Second Report and Order* addressed the various objections in the record and effectively demonstrated that the Commission has the authority to require disclosure of SSAs in order help the Commission obtain information relevant to its statutory responsibilities. Any efforts to ascertain the potential impact of these agreements on the Commission's policy goals should not be read to imply only a negative impact. SSAs may help facilitate improved service in local communities, and disclosure of these agreements may provide greater insight into such potential benefits. The *Second Report and Order* set forth a sufficient justification for requiring disclosure in these circumstances, and NAB's brief argument to the contrary in its request for reconsideration gives the Commission no cause to disturb the underlying decision at this time.

106. While the Commission is upholding the decision in the *Second Report and Order* to require disclosure, the Commission emphasizes that its action is not a pretext for future regulation of SSAs. As the Third Circuit recognized, the Commission acted appropriately in declining to attribute these agreements in this proceeding, as some commenters had requested. Among other things, the Commission has admitted that it lacks an understanding of the potential impact of SSAs on a station's core operating functions, and evidence in the record suggests that these agreements help produce significant public interest benefits. Accordingly, any consideration of the regulatory status of these agreements by a future Commission must reflect significant study and understanding of the impact of these agreements on station operations and a complete account of the public interest benefits these agreements help facilitate. Furthermore, while the record compiled in this proceeding does not demonstrate that the disclosure requirement will unduly burden commercial television broadcasters, the Commission retains the authority to revisit this disclosure requirement should evidence of such burdens arise after the disclosure requirement is implemented or experience demonstrate that the benefits

of this requirement are outweighed by its costs.

*G. Diversity/Incubator Program*

1. Introduction

107. The Commission grants in part and denies in part NAB's request for reconsideration regarding the Commission's decision in the *Second Report and Order* not to adopt an incubator program on the current record. The Commission agrees that it should adopt such a program and decides in this *Order* that it will do so. However, the Commission also finds that the underlying record fails to provide sufficient guidance on how best to structure such a program. Accordingly, the Commission adopts in this *Order* a Notice of Proposed Rulemaking seeking comment on how the Commission should structure the incubator program.

2. Background

108. As explained in greater detail in the accompanying Notice of Proposed Rulemaking, an incubator program would provide an ownership rule waiver or similar benefits to a company that establishes a program to help facilitate station ownership for a certain class of new owners. The concept of an incubator program has been discussed since at least the early 1990s. Yet, despite general support for the concept, the Commission has never undertaken the creation of a comprehensive incubator program. The Commission has adopted a limited program that provides a duopoly preference to parties that agree to incubate or finance an eligible entity. In adopting this general policy preference, however, the Commission did not provide details regarding the structure and operation of the incubation activities. As such, the Commission does not believe that this limited policy preference serves as an effective basis upon which to design a comprehensive incubator program.

109. Most recently, the Commission sought comment in the *NPRM* and *FNPRM* on whether to adopt an incubator program and, if so, how to structure such a program. In the *FNPRM,* in particular, the Commission highlighted administrative concerns and structural issues that needed to be addressed before such a program could be adopted. While there was general support for an incubator program, and some suggestions on how to structure certain aspects of such a program, the Commission found in the *Second Report and Order* that the record failed to address the specific concerns detailed in the *FNPRM;* accordingly, the

Commission declined to adopt an incubator program. NAB sought reconsideration of the Commission's rejection of NAB's recommendation for an incubator program. According to NAB, the Commission could create an incubator program based on the overcoming disadvantages preference (ODP) standard, which the Commission rejected in the *Second Report and Order,* or the new entrant criteria in the broadcast services' auction rules. The petition otherwise fails to address the many other issues of concern highlighted by the Commission in this proceeding.

3. Discussion

110. On reconsideration, the Commission agrees with NAB that it should adopt an incubator program and decides here that it will do so. There is support for an incubator program from many industry participants and advocacy groups. And the Commission agrees with supporters that adopting an incubator program would promote new entry and ownership diversity in the broadcast industry by helping address barriers to station ownership, such as lack of access to capital and the need for technical/operational experience. In this proceeding, however, the Commission has identified various, specific concerns regarding how to structure and monitor such a program. The Commission finds that the comments and recommendations in the record fail to adequately address all of these issues. While certain suggestions may have merit in regards to specific aspects of the program, the Commission is not yet at the point where it can finalize the overall structure and method for implementation of the program. Therefore, the Commission requires additional comment on how to structure the incubator program.

111. The Commission is initiating a new proceeding in the accompanying Notice of Proposed Rulemaking that will seek additional comment on how best to implement the Commission's incubator program. Initiating a dedicated proceeding will allow the Commission to focus its efforts on getting this program up and running, and the Commission anticipates that its consideration of this issue will be assisted by the newly established Advisory Committee on Diversity and Digital Empowerment.

**IV. Procedural Matters**

*A. Supplemental Final Regulatory Flexibility Analysis*

112. In compliance with the Regulatory Flexibility Act (RFA), this Supplemental Final Regulatory Flexibility Analysis (Supplemental FRFA) supplements the Final Regulatory Flexibility Analysis (FRFA) included in the *Second Report and Order,* to the extent that changes adopted on reconsideration require changes to the information included and conclusions reached in the FRFA. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *NPRM* that initiated this proceeding. The Commission sought written public comment on the proposals in the *NPRM,* including comment on the IRFA. The Commission also incorporated a Supplemental Initial Regulatory Flexibility Analysis (Supplemental IRFA) in the *FNPRM* in this proceeding. The Commission sought written public comment on the proposals in the *FNPRM,* including comment on the Supplemental IRFA. The Commission received no comments in response to the IRFA or the Supplemental IRFA. This present Supplemental FRFA conforms to the RFA.

113. *Response to Public Comments and Comments by the Chief Counsel for Advocacy of the Small Business Administration.* Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA) and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

114. *Description and Estimate of the Number of Small Entities to Which Rules Will Apply.* The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted. The RFA generally defines the term small entity as having the same meaning as the terms small business, small organization, and small governmental jurisdiction. In addition, the term small business has the same meaning as the term small business concern under the Small Business Act. A small business concern is one which: (1) Is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA. The final rules adopted in this *Order* affect small television and radio broadcast stations and small entities that operate daily newspapers. A description of these small entities, as well as an estimate of

the number of such small entities, is provided below.

115. *Television Broadcasting.* This Economic Census category comprises establishments primarily engaged in broadcasting images together with sound. These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA has created the following small business size standard for such businesses: Those having $38.5 million or less in annual receipts. The 2012 Economic Census data reports that 751 such firms in this category operated in that year. Of that number, 656 had annual receipts of $25,000,000 or less, 25 had annual receipts between $25,000,000 and $49,999,999 and 70 had annual receipts of $50,000,000 or more. Based on this data, the Commission therefore estimates that the majority of commercial television broadcasters are small entities under the applicable SBA size standard.

116. The Commission has estimated the number of licensed commercial television stations to be 1,382. Of this total, 1,262 stations (or about 91 percent) had revenues of $38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on May 9, 2017, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission has estimated the number of licensed noncommercial educational television stations to be 393. Notwithstanding, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

117. The Commission notes, however, that, in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations must be included. The Commission's estimate, therefore, likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, another element of the definition of small business is that the entity not be dominant in its field of operation. The Commission is unable at

this time to define or quantify the criteria that would establish whether a specific television broadcast station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply do not exclude any television broadcast station from the definition of a small business on this basis and are therefore possibly over-inclusive. There are also 2,385 LPTV stations, including Class A stations, and 3,776 TV translator stations. Given the nature of these services, the Commission will presume that all of these entities qualify as small entities under the above SBA small business size standard. Also, as noted above, an additional element of the definition of small business is that the entity must be independently owned and operated. The Commission notes that it is difficult at times to assess these criteria in the context of media entities and its estimates of small businesses to which they apply may be over-inclusive to this extent.

118. *Radio Stations.* This Economic Census category comprises establishments primarily engaged in broadcasting aural programs by radio to the public. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA has established a small business size standard for this category as firms having $38.5 million or less in annual receipts. Economic Census data for 2012 shows that 2,849 radio station firms operated during that year. Of that number, 2,806 operated with annual receipts of less than $25 million per year, 17 with annual receipts between $25 million and $49,999,999 million and 26 with annual receipts of $50 million or more. Therefore, based on the SBA's size standard the majority of such entities are small businesses.

119. According to Commission staff review of the BIA/Kelsey, LLC's Media Access Pro Radio Database on May 9, 2017, about 11,392 (or about 99.9 percent) of 11,401 of commercial radio stations had revenues of $38.5 million or less and thus qualify as small entities under the SBA definition. The Commission has estimated the number of licensed commercial radio stations to be 11,401. The Commission notes it has also estimated the number of licensed noncommercial radio stations to be 4,111. Nevertheless, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

120. The Commission also notes, that in assessing whether a business concern qualifies as small under the above

definition, business (control) affiliations must be included. The Commission's estimate, therefore, likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, an element of the definition of small business is that the entity not be dominant in its field of operation. The Commission further notes, that it is difficult at times to assess these criteria in the context of media entities, and the estimate of small businesses to which these rules may apply does not exclude any radio station from the definition of a small business on these basis, thus the Commission's estimate of small businesses may therefore be over-inclusive. Also, as noted above, an additional element of the definition of small business is that the entity must be independently owned and operated. The Commission notes that it is difficult at times to assess these criteria in the context of media entities and the estimates of small businesses to which they apply may be over-inclusive to this extent.

121. *Daily Newspapers.* The SBA has developed a small business size standard for the census category of Newspaper Publishers; that size standard is 1,000 or fewer employees. Business concerns included in this category are those that carry out operations necessary for producing and distributing newspapers, including gathering news; writing news columns, feature stories, and editorials; and selling and preparing advertisements. Census Bureau data for 2012 show that there were 4,168 firms in this category that operated for the entire year. Of this total, 4,107 firms had employment of 499 or fewer employees, and an additional 22 firms had employment of 500 to 999 employees. Therefore, the Commission estimates that the majority of Newspaper Publishers are small entities that might be affected by its action.

122. *Description of Reporting, Record Keeping, and other Compliance Requirements for Small Entities.* The *Order on Reconsideration* eliminates the Newspaper/Broadcast Cross-Ownership Rule and the Radio/Television Cross-Ownership Rule, modifies the Local Television Ownership Rule and, and eliminates the Television JSA Attribution Rule. The *Order on Reconsideration* does not adopt any new reporting, recordkeeping, or compliance requirements for small entities. The *Order on Reconsideration* thus will not impose additional obligations or expenditure of resources on small

businesses. In addition, to conform to the elimination of the Television JSA Attribution Rule, parties to JSAs that were attributable under the previous rule will no longer be required to file the agreements with the Commission pursuant to section 73.3613 of the Commission's rules.

123. *Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered.* The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives (among others): (1) The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities.

124. In conducting the quadrennial review, the Commission has three chief alternatives available for each of the Commission's media ownership rules— eliminate the rule, modify it, or, if the Commission determines that the rule is necessary in the public interest, retain it. The Commission finds that the modification and elimination of the rules in the *Order on Reconsideration,* which are intended to achieve the policy goals of competition, localism, and viewpoint diversity, will continue to benefit small entities by fostering a media marketplace in which they are better able to compete and by promoting additional broadcast ownership opportunities, as described below, among a diverse group of owners, including small entities. The Commission discusses below several ways in which the rules may benefit small entities as well as steps taken, significant alternatives considered, to minimize any potential burdens on small entities.

125. *Newspaper/Broadcast Cross-Ownership (NBCO) Rule.* In the Order on Reconsideration, the Commission considered whether to retain, modify, or eliminate the NBCO Rule. The Commission determined that the NBCO Rule is no longer in the public interest and should be repealed. As an alternative to the action taken, the Commission considered whether to adopt a modified NBCO Rule, but rejected that approach as unsupported by the record. As a result, newspapers will be able to combine with television and radio stations within the same local

market, subject only to the Local Television and Local Radio Ownership Rules. Repeal of the NBCO Rule in its entirety eliminates the economic burden of compliance with the rule on small entities. Furthermore, repeal of the rule will allow broadcasters and local newspapers to seek out new sources of investment and operational expertise, potentially increasing the quantity and quality of local news and information they provide to consumers. Small broadcasters may find that merging with a newspaper could boost their ability to serve their local markets. The Order on Reconsideration finds that the NBCO Rule created considerable harm in small markets where the benefits of cross-ownership could have helped to sustain the local news outlets, many of which are likely to be small entities. Elimination of the rule will help promote additional investment opportunities for small entities in many local markets. The *Order on Reconsideration* also concludes that repeal of the NBCO Rule is unlikely to have a material effect on minority and female ownership of newspapers and broadcast stations.

126. *Radio/Television Cross-Ownership Rule.* In the *Order on Reconsideration,* the Commission considers whether to retain, modify, or eliminate the Radio/Television Cross-Ownership Rule. The Commission finds that the Radio/Television Cross-Ownership Rule no longer serves the public interest and should be repealed. The Commission considers whether to adopt a modified rule, but rejects that approach as unsupported by the record. Eliminating the rule allows television stations and radio stations in the same market to be commonly owned provided that such ownership arrangements otherwise comply with the Local Television and Local Radio Ownership Rules. As with the NBCO Rule, repeal of the Radio/Television Cross-Ownership Rule in its entirety eliminates the economic impact of the rule on small entities. Small entities in particular may benefit from the aforementioned efficiencies and benefits of common ownership enabled by the rule's repeal. The Commission also finds that repeal of the Radio/Television Cross-Ownership rule is unlikely to have an effect on minority and female ownership of broadcast television and radio stations.

127. *Local Television Ownership Rule.* In the *Order on Reconsideration,* the Commission finds that the existing Local Television Ownership Rule is no longer necessary in the public interest but should be modified further to enable television stations to compete more

effectively. Accordingly, the Commission repeals the Eight-Voices Test that had required at least eight independently owned television stations to remain in a market after combining ownership of two stations in the market. The Commission considers whether to adopt a different voice test, but rejects that approach as unsupported by the record. In addition, the Commission considers whether to retain, modify, or eliminate the Top-Four Prohibition, a prohibition against common ownership of two top-four ranked stations in all markets. The Commission finds that the record generally supported the Commission's decision in the *Second Report and Order* to treat combinations involving two top-four rated stations differently than other combinations, but on reconsideration the Commission modifies the rule to include a case-by-case approach to account for circumstances in which strict application of the prohibition is not in the public interest. Under the new modified television ownership rule an entity may own two television stations in the same DMA if (1) the digital noise limited service contours (NLSCs) of the stations (as determined by section 73.622(e)) do not overlap; or (2) at least one of the stations is not ranked among the top four stations in the market. The Commission will consider combinations otherwise barred by the Top-Four Prohibition on a case-by-case basis.

128. The modifications to the Local Television Ownership Rule are not expected to create additional burdens for small entities. Conversely, the economic impact of the rule modification may benefit small entities by enabling them to achieve operational efficiencies through common ownership. The *Order on Reconsideration* also concludes that the modifications to the Local Television Ownership Rule are unlikely to have an effect on minority and female ownership of broadcast television stations.

129. *Television JSA Attribution Rule.* On reconsideration, the Commission considers whether to retain or eliminate the Television JSA Attribution Rule. The Commission finds that the rule was unsupported by the record and does not serve the public interest and therefore should be repealed. The repeal of the Television JSA Attribution Rule eliminates the economic burden of the rule on small entities. In the rapidly changing video marketplace, television JSAs help reduce costs and attract vital revenue at a time of increasing competition for advertising and viewership. Efficiencies provided by

JSAs also enable broadcasters to improve or increase services for local communities, thus fostering significant public interest benefits. Local television broadcasters—particularly in small- and medium-sized markets—stand to benefit from these efficiencies that television JSAs create. The repeal of the attribution rule will remove a regulatory disincentive for stations to enter into JSAs and enable these stations to better serve their communities. In addition, because of the elimination of the Television JSA Attribution Rule, parties to JSAs that were attributable under the previous rule will no longer be required to file the agreements with the Commission, thus eliminating that economic burden.

*B. Paperwork Reduction Act Analysis*

130. This *Order on Reconsideration* contains information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. The requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the information collection requirements contained in this proceeding. The Commission will publish a separate document in the **Federal Register** at a later date seeking these comments. In addition, the Commission notes that, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), the Commission previously sought specific comment on how it might further reduce the information collection burden for small business concerns with fewer than 25 employees.

*C. Congressional Review Act*

131. The Commission will send a copy of this *Order on Reconsideration* to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. 801(a)(1)(A).

**V. Ordering Clauses**

132. Accordingly, *it is ordered* that, pursuant to the authority contained in sections 1, 2(a), 4(i), 257, 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152(a), 154(i), 257, 303, 307, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996, this Order on Reconsideration *is adopted.*

133. *It is further ordered* that, pursuant to section 405 of the Communications Act of 1934, as amended, 47 U.S.C. 405, and section 1.429 of the Commission's rules, 47 CFR

1.429, that the petitions for reconsideration filed by (1) Connoisseur Media, LLC *is granted, in part, and otherwise denied* as set forth herein; (2) the National Association of Broadcasters *is granted, in part, and otherwise denied* as set forth herein; and (3) Nexstar Broadcasting, Inc. *is granted, in part, and otherwise denied* as set forth herein.

134. *It is further ordered* that UCC et al.'s Motion to Strike and Dismiss *is denied* as set forth herein.

135. *It is further ordered* that the Order on Reconsideration and the rule modifications attached hereto *shall be effective* February 7, 2018, except for those rules and requirements involving Paperwork Reduction Act burdens, which shall become effective on the effective date announced in the **Federal Register** notice announcing OMB approval.

136. *It is further ordered,* that the proceedings MB Docket No. 04−256, MB Docket No. 09−182, and MB Docket No. 14−50 *are terminated.*

### List of Subjects in 47 CFR Part 73

Radio, Reporting and recordkeeping requirements, Television.

Federal Communications Commission.

**Katura Jackson,**

*Federal Register Liaison Officer, Office of the Secretary.*

### Final Rules

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

■ 1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 303, 309, 310, 334, 336 and 339.

■ 2. Amend § 73.3555 as follows:
■ a. Revise paragraph (b);
■ b. Remove and reserve paragraphs (c) and (d);
■ c. Revise the introductory text, paragraphs a. through d., and paragraphs g. through k. of Note 2 to § 73.3555;
■ d. Revise Notes 4 through 7 to § 73.3555;
■ e. Revise Note 9 to § 73.3555; and
■ f. Remove Note 12 to § 73.3555.
The revisions read as follows:

### § 73.3555  Multiple ownership.

\*    \*    \*    \*    \*

(b) *Local television multiple ownership rule.* (1) An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) if:

(i) The digital noise limited service contours of the stations (computed in accordance with § 73.622(e)) do not overlap; or

(ii) At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.–midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.

(2) Paragraph (b)(1)(ii) (Top-Four Prohibition) of this section shall not apply in cases where, at the request of the applicant, the Commission makes a finding that permitting an entity to directly or indirectly own, operate, or control two television stations licensed in the same DMA would serve the public interest, convenience, and necessity. The Commission will consider showings that the Top-Four Prohibition should not apply due to specific circumstances in a local market or with respect to a specific transaction on a case-by-case basis.

(c)–(d) [Reserved]

\*    \*    \*    \*    \*

**Note 2 to § 73.3555:**

In applying the provisions of this section, ownership and other interests in broadcast licensees will be attributed to their holders and deemed cognizable pursuant to the following criteria:

a. Except as otherwise provided herein, partnership and direct ownership interests and any voting stock interest amounting to 5% or more of the outstanding voting stock of a corporate broadcast licensee will be cognizable;

b. Investment companies, as defined in 15 U.S.C. 80a–3, insurance companies and banks holding stock through their trust departments in trust accounts will be considered to have a cognizable interest only if they hold 20% or more of the outstanding voting stock of a corporate broadcast licensee, or if any of the officers or directors of the broadcast licensee are representatives of the investment company, insurance company or bank concerned. Holdings by a bank or insurance company will be aggregated if the bank or insurance company has any right to determine how the stock will be voted. Holdings by investment companies will be aggregated if under common management.

c. Attribution of ownership interests in a broadcast licensee that are held indirectly by any party through one or more intervening corporations will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, except that wherever the ownership percentage for any link in the chain exceeds 50%, it shall not be included for purposes of this multiplication. For purposes of paragraph i. of this note, attribution of ownership interests in a broadcast licensee that are held indirectly by any party through one or more intervening organizations will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, and the ownership percentage for any link in the chain that exceeds 50% shall be included for purposes of this multiplication. [For example, except for purposes of paragraph i. of this note, if A owns 10% of company X, which owns 60% of company Y, which owns 25% of ''Licensee,'' then X's interest in ''Licensee'' would be 25% (the same as Y's interest because X's interest in Y exceeds 50%), and A's interest in ''Licensee'' would be 2.5% ($0.1 \times 0.25$). Under the 5% attribution benchmark, X's interest in ''Licensee'' would be cognizable, while A's interest would not be cognizable. For purposes of paragraph i. of this note, X's interest in ''Licensee'' would be 15% ($0.6 \times 0.25$) and A's interest in ''Licensee'' would be 1.5% ($0.1 \times 0.6 \times 0.25$). Neither interest would be attributed under paragraph i. of this note.]

d. Voting stock interests held in trust shall be attributed to any person who holds or shares the power to vote such stock, to any person who has the sole power to sell such stock, and to any person who has the right to revoke the trust at will or to replace the trustee at will. If the trustee has a familial, personal or extra-trust business relationship to the grantor or the beneficiary, the grantor or beneficiary, as appropriate, will be attributed with the stock interests held in trust. An otherwise qualified trust will be ineffective to insulate the grantor or beneficiary from attribution with the trust's assets unless all voting stock interests held by the grantor or beneficiary in the relevant broadcast licensee are subject to said trust.

\*    \*    \*    \*    \*

g. Officers and directors of a broadcast licensee are considered to have a cognizable interest in the entity with which they are so associated. If any such entity engages in businesses in

USCA Case #18-1071    Document #1721291    Filed: 03/07/2018    Page 32 of 33

addition to its primary business of broadcasting, it may request the Commission to waive attribution for any officer or director whose duties and responsibilities are wholly unrelated to its primary business. The officers and directors of a parent company of a broadcast licensee, with an attributable interest in any such subsidiary entity, shall be deemed to have a cognizable interest in the subsidiary unless the duties and responsibilities of the officer or director involved are wholly unrelated to the broadcast licensee, and a statement properly documenting this fact is submitted to the Commission. [This statement may be included on the appropriate Ownership Report.] The officers and directors of a sister corporation of a broadcast licensee shall not be attributed with ownership of that licensee by virtue of such status.

h. Discrete ownership interests will be aggregated in determining whether or not an interest is cognizable under this section. An individual or entity will be deemed to have a cognizable investment if:

1. The sum of the interests held by or through ''passive investors'' is equal to or exceeds 20 percent; or

2. The sum of the interests other than those held by or through ''passive investors'' is equal to or exceeds 5 percent; or

3. The sum of the interests computed under paragraph h. 1. of this note plus the sum of the interests computed under paragraph h. 2. of this note is equal to or exceeds 20 percent.

i.1. Notwithstanding paragraphs e. and f. of this Note, the holder of an equity or debt interest or interests in a broadcast licensee subject to the broadcast multiple ownership rules (''interest holder'') shall have that interest attributed if:

A. The equity (including all stockholdings, whether voting or nonvoting, common or preferred) and debt interest or interests, in the aggregate, exceed 33 percent of the total asset value, defined as the aggregate of all equity plus all debt, of that broadcast licensee; and

B.(i) The interest holder also holds an interest in a broadcast licensee in the same market that is subject to the broadcast multiple ownership rules and is attributable under paragraphs of this note other than this paragraph i.; or

(ii) The interest holder supplies over fifteen percent of the total weekly broadcast programming hours of the station in which the interest is held. For purposes of applying this paragraph, the term, ''market,'' will be defined as it is defined under the specific multiple ownership rule that is being applied,

except that for television stations, the term ''market'' will be defined by reference to the definition contained in the local television multiple ownership rule contained in paragraph (b) of this section.

2. Notwithstanding paragraph i.1. of this Note, the interest holder may exceed the 33 percent threshold therein without triggering attribution where holding such interest would enable an eligible entity to acquire a broadcast station, provided that:

i. The combined equity and debt of the interest holder in the eligible entity is less than 50 percent, or

ii. The total debt of the interest holder in the eligible entity does not exceed 80 percent of the asset value of the station being acquired by the eligible entity and the interest holder does not hold any equity interest, option, or promise to acquire an equity interest in the eligible entity or any related entity. For purposes of this paragraph i.2, an ''eligible entity'' shall include any entity that qualifies as a small business under the Small Business Administration's size standards for its industry grouping, as set forth in 13 CFR 121.201, at the time the transaction is approved by the FCC, and holds:

A. 30 percent or more of the stock or partnership interests and more than 50 percent of the voting power of the corporation or partnership that will own the media outlet; or

B. 15 percent or more of the stock or partnership interests and more than 50 percent of the voting power of the corporation or partnership that will own the media outlet, provided that no other person or entity owns or controls more than 25 percent of the outstanding stock or partnership interests; or

C. More than 50 percent of the voting power of the corporation that will own the media outlet if such corporation is a publicly traded company.

j. ''Time brokerage'' (also known as ''local marketing'') is the sale by a licensee of discrete blocks of time to a ''broker'' that supplies the programming to fill that time and sells the commercial spot announcements in it.

1. Where two radio stations are both located in the same market, as defined for purposes of the local radio ownership rule contained in paragraph (a) of this section, and a party (including all parties under common control) with a cognizable interest in one such station brokers more than 15 percent of the broadcast time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraph (a) of this section. This limitation shall apply regardless of

the source of the brokered programming supplied by the party to the brokered station.

2. Where two television stations are both located in the same market, as defined in the local television ownership rule contained in paragraph (b) of this section, and a party (including all parties under common control) with a cognizable interest in one such station brokers more than 15 percent of the broadcast time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (b) and (e) of this section. This limitation shall apply regardless of the source of the brokered programming supplied by the party to the brokered station.

3. Every time brokerage agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the provisions of paragraph (b) of this section if the brokering station is a television station or with paragraph (a) of this section if the brokering station is a radio station.

k. ''Joint Sales Agreement'' is an agreement with a licensee of a ''brokered station'' that authorizes a ''broker'' to sell advertising time for the ''brokered station.''

1. Where two radio stations are both located in the same market, as defined for purposes of the local radio ownership rule contained in paragraph (a) of this section, and a party (including all parties under common control) with a cognizable interest in one such station sells more than 15 percent of the advertising time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraph (a) of this section.

2. Every joint sales agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities, including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the limitations set forth in paragraph (a) of this section if the brokering station is a radio station.

*    *    *    *    *

**Note 4 to § 73.3555:**

Paragraphs (a) and (b) of this section will not be applied so as to require divestiture, by any licensee, of existing facilities, and will not apply to applications for license or transfer of control filed in accordance with § 73.3540(f) or § 73.3541(b), or to applications for assignment of license or transfer of control to heirs or legatees by will or intestacy, or to FM or AM broadcast minor modification applications for intra-market community of license changes, if no new or increased concentration of ownership would be created among commonly owned, operated or controlled broadcast stations. Paragraphs (a) and (b) of this section will apply to all applications for new stations, to all other applications for assignment or transfer, to all applications for major changes to existing stations, and to all other applications for minor changes to existing stations that seek a change in an FM or AM radio station's community of license or create new or increased concentration of ownership among commonly owned, operated or controlled broadcast stations. Commonly owned, operated or controlled broadcast stations that do not comply with paragraphs (a) and (b) of this section may not be assigned or transferred to a single person, group or entity, except as provided in this Note, the Report and Order in Docket No. 02–277, released July 2, 2003 (FCC 02–127), or the Second Report and Order in MB Docket No. 14–50, FCC 16–107 (released August 25, 2016).

**Note 5 to § 73.3555:**

Paragraphs (b) and (e) of this section will not be applied to cases involving television stations that are "satellite" operations. Such cases will be considered in accordance with the analysis set forth in the Report and Order in MM Docket No. 87–8, FCC 91–182 (released July 8, 1991), in order to determine whether common ownership, operation, or control of the stations in question would be in the public interest. An authorized and operating "satellite" television station, the digital noise limited service contour of which overlaps that of a commonly owned, operated, or controlled "non-satellite" parent television broadcast station may subsequently become a "non-satellite" station under the circumstances described in the aforementioned Report and Order in MM Docket No. 87–8. However, such commonly owned, operated, or controlled "non-satellite" television stations may not be transferred or assigned to a single

person, group, or entity except as provided in Note 4 of this section.

**Note 6 to § 73.3555:**

Requests submitted pursuant to paragraph (b)(2) of this section will be considered in accordance with the analysis set forth in the Order on Reconsideration in MB Docket Nos. 14–50, et al. (FCC 17–156).

**Note 7 to § 73.3555:**

The Commission will entertain applications to waive the restrictions in paragraph (b) of this section (the local television ownership rule) on a case-by-case basis. In each case, we will require a showing that the in-market buyer is the only entity ready, willing, and able to operate the station, that sale to an out-of-market applicant would result in an artificially depressed price, and that the waiver applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA. One way to satisfy these criteria would be to provide an affidavit from an independent broker affirming that active and serious efforts have been made to sell the permit, and that no reasonable offer from an entity outside the market has been received.

We will entertain waiver requests as follows:

1. If one of the broadcast stations involved is a "failed" station that has not been in operation due to financial distress for at least four consecutive months immediately prior to the application, or is a debtor in an involuntary bankruptcy or insolvency proceeding at the time of the application.

2. If one of the television stations involved is a "failing" station that has an all-day audience share of no more than four per cent; the station has had negative cash flow for three consecutive years immediately prior to the application; and consolidation of the two stations would result in tangible and verifiable public interest benefits that outweigh any harm to competition and diversity.

3. If the combination will result in the construction of an unbuilt station. The permittee of the unbuilt station must demonstrate that it has made reasonable efforts to construct but has been unable to do so.

*        *        *        *        *

**Note 9 to § 73.3555**

Paragraph (a)(1) of this section will not apply to an application for an AM station license in the 1605–1705 kHz band where grant of such application will result in the overlap of the 5 mV/m groundwave contours of the proposed station and that of another AM station

in the 535–1605 kHz band that is commonly owned, operated or controlled.

*        *        *        *        *

■ 3. Amend § 73.3613 by revising paragraph (d)(2) to read as follows:

**§ 73.3613    Filing of contracts.**

*        *        *        *        *

(d) * * *

(2) *Joint sales agreements:* Joint sales agreements involving radio stations where the licensee (including all parties under common control) is the brokering entity, the brokering and brokered stations are both in the same market as defined in the local radio multiple ownership rule contained in § 73.3555(a), and more than 15 percent of the advertising time of the brokered station on a weekly basis is brokered by that licensee. Confidential or proprietary information may be redacted where appropriate but such information shall be made available for inspection upon request by the FCC.

*        *        *        *        *

[FR Doc. 2017–28329 Filed 1–5–18; 8:45 am]

**BILLING CODE 6712–01–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 660**

**[Docket No. 170627602–7999–02]**

**RIN 0648–BG98**

**Magnuson-Stevens Act Provisions; Fisheries Off West Coast States; Pacific Coast Groundfish Fishery; Pacific Whiting; Pacific Coast Groundfish Fishery Management Plan; Amendment 21–3; Trawl Rationalization Program**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

---

**SUMMARY:** NMFS issues this final rule to change the management of the Pacific whiting at-sea sectors' (*i.e.,* the Mothership [MS] and Catcher/Processor [C/P] sectors) allocations for darkblotched rockfish and Pacific ocean perch (POP) by managing the allocations as set-asides rather than as total catch limits, under the authority of the Pacific Coast Groundfish Fishery Management Plan (FMP), and the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). This rule revises regulations in accordance with